No. 47,553

Jay C. Storts, *Appellant*, v. Martin K. Eby Construction Company, *Appellee.*

(535 P. 2d 908)

Opinion filed May 10, 1975.

*John P. Woolf,* of Martin, Pringle, Schell and Fair, of Wichita, argued the cause, and *J. Taylor Neuschwander,* of the same firm was with him on the brief for the appellant.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Mikel L. Stout,* of the same firm was with him on the brief for the appellee.

The opinion of the court was delivered by

Harman, C.: This is an appeal from summary judgment denying an employee of a subcontractor the right to maintain a tort action against the general contractor for personal injury on the basis the employee's exclusive remedy was under the workmen's compensation act pursuant to K. S. A. 44-503 (*a*). The primary issue is whether a contract existed between the general contractor and the subcontractor at the time of the plaintiff's injury.

Plaintiff Jay C. Storts, an employee of Kendall, Inc., was severely injured on June 12, 1970, when the wall of a storm sewer excavation collapsed on him. Plaintiff was provided workmen's compensation and medical aid by Kendall and its insurance carrier. He instituted this action to recover damages allegedly caused by the negligence of the general contractor, Martin K. Eby Construction Company.

Garvey Center, Inc. was the developer of an area in downtown Wichita known as the Kiva project, which included a high rise motel, a theater, a parking garage and three office buildings. Eby had previously been the general contractor for Garvey in constructing the garage. On January 16, 1970, after conferences between the two, Garvey notified Eby it had been selected as the general contractor to work with the architects further to develop the project and a construction contract. The agreement was to be a negotiated contract project wherein the construction company worked with the architect during design phases prior to a formal written contract between Garvey and Eby. The arrangement was to be a cost plus contract with a maximum guaranteed cost (not to exceed a certain amount).

On February 18, 1970, Eby sent a letter to Kendall inviting a proposal for mechanical work (air-conditioning, heating, ventilating and plumbing) to be done on the Kiva project. The letter stated the work would be done on a *maximum guaranteed price basis* with Kendall to compute the maximum cost for the complete job when the mechanical drawings were available; Kendall was requested to propose the percentage above cost for which it would do the work; upon completion of the job if the cost plus percentage figure was less than the maximum guaranteed price the lesser amount would be paid.

Kendall replied by letter February 23, 1970, in which it proposed to do the work on phase one of the project for cost plus 12% and on phase two for cost plus 15%. Kendall pointed out it had been the mechanical contractor on two of the Garvey buildings in the project.

By letter dated March 3, 1970, Eby accepted Kendall's proposal to do the mechanical work. The letter further stated: "The award was made based on your proposal dated February 23, 1970, with one exception. The job will be awarded on a maximum guaranteed cost basis, and not a true cost plus job."

On March 12, 1970, Kendall sent a letter to Eby which detailed how Kendall would compute its cost. The letter concluded with

this: "Thank you for the opportunity of working with you on this project."

Meanwhile, there had been oral discussions between Eby and Kendall officials as to excavation work necessary in connection with Kendall's part of the project—Eby was to do this with its own backhoe and operator.

On April 23, 1970, Garvey authorized Eby to commence construction on May 1, 1970; however, the formal written contract between them was not signed until late in December, 1970. In the middle part of May, 1970, Kendall entered the site and commenced its work on the project.

On June 15, 1970, after Kendall received its copy of the plans and specifications, it submitted a maximum cost figure on the project of $419,016. Although excavation was not specifically mentioned this figure included the cost of excavation necessary in connection with Kendall's portion of the work.

The formal written subcontract between Eby and Kendall, prepared by the former, was dated June 10, 1970. On that date Eby, in accord with its custom, mailed two unsigned copies of the contract to Kendall. This contract specifically provided Eby was to furnish the labor and equipment for machine excavation and backfill. The contract price, by reason of this work by Eby, was stated as $5,576.00 less than the afore-mentioned figure, or $413,440. Kendall signed the two copies of the subcontract and returned them to Eby by letter of transmittal dated June 15, 1970. The contracts were then signed by Eby.

Meanwhile plaintiff's injury occurred on June 12, 1970. The ditch in question had been dug June 9th by Eby's backhoe operator using Eby's backhoe. The next day pipe was run into it and inspected and backfilling had been commenced. The ditch had not been shored. On June 12th while the workers were waiting for another load of sand for backfill plaintiff asked his foreman if he should repair a gasket that looked out of place on the pipe in the ditch. The foreman said it was okay the way it was but plaintiff could suit himself. Plaintiff entered the ditch and it collapsed upon him. Plaintiff had been in the same ditch earlier that day.

This action was instituted by the filing of plaintiff's petition alleging that at a time when no contract existed between Eby and his employer Kendall he was injured by Eby's negligence in failing to shore the ditch and in failing to warn him of the dangerous condi-

tions. In the alternative he alleged that if a contract existed between the two contractors then Eby was Kendall's subcontractor as to the excavation work.

Eby's answer, among other things, denied the nonexistence of a contract and asserted exclusivity of the workmen's compensation act. After the taking of depositions to which were attached the writings already referred to and entry of a pretrial conference order which included certain stipulations Eby filed a motion for summary judgment upon three grounds: The exclusivity of the remedy of workmen's compensation, that there was no evidence of Eby's negligence and plaintiff was guilty of contributory negligence as a matter of law. This motion was twice argued to the trial court. The court sustained the motion upon the first ground but made no ruling as to either of the negligence questions. The court found that on the date of the accident a contract existed between Garvey and Eby and a subcontract existed between Eby and Kendall; that Eby was not a subcontractor of Kendall. It ruled that the provisions of the workmen's compensation act barred plaintiff's tort action. Plaintiff has appealed from the summary judgment.

Appellant Storts contends that prior to the accident on June 12, 1970, appellee Eby and his employer Kendall had not entered into a binding contract and did not do so until appellee formally signed the written contract on June 15, 1970. He concedes now, and did so also at trial level, that K. S. A. 44-503 (a) bars tort actions by employees of subcontractors against the prime contractor and, where this is the case, the employee's exclusive remedy is a claim for workmen's compensation, citing *Watson v. Dickey Clay Mfg. Co.*, 202 Kan. 366, 450 P. 2d 10. He also concedes now as he did at trial that if a contract existed between the two his primary theory for recovery herein has no merit. Appellant further contends the issue as to when appellee and Kendall entered into a binding contract was a disputed fact question, thus rendition of summary judgment was premature. The two contentions may be considered together.

First we note the parties agreed at pretrial conference that all discovery necessary for determination of the liability issue had been completed and further that appellee could file a motion for summary judgment prior to trial. The question now is whether the trial court properly determined the relationship of the parties as a matter of law.

The general rule is that in order for parties to form a binding contract there must be a meeting of the minds as to the essential terms of the contract (*Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, 479 P. 2d 875). Appellant argues that prior to the date of the accident the parties were still negotiating and had not reached a meeting of the minds. We have already summarized the correspondence between the two contractors: The invitation to bid, Kendall's response and appellee's acceptance letter of March 3, 1970. This latter stated:

"We have decided to have your company work with us on the above project. The award was made based on your proposal dated February 23, 1970, *with one exception. The job will be awarded on a maximum guaranteed cost basis, and not a true cost plus job.*

"We will expect you to work with our people, the design engineers and the architects in doing everything possible to present the best mechanical system possible for the least amount of money, still meeting design requirements.

"I would appreciate your contacting me about estimating procedure on the project." ( Our emphasis. )

Pointing out that an acceptance must be unconditional and not impose new terms, and relying on the language emphasized above, appellant says the March 3rd letter of acceptance varied the terms offered. We cannot agree. The portion upon which appellant relies merely repeated appellee's letter of February 18, 1970, in which it was stated the job would be awarded on a maximum guaranteed cost basis. No new terms were introduced or imposed. The statement "with one exception" was inappropriate and inaccurate because no exception in fact existed nor could any have been understood. Subsequently, on March 12, 1970, Kendall sent appellee its letter detailing how it computed its costs and closing with an expression of thanks for being accepted for the job.

Appellee and Kendall agree that, at the latest, they had on March 12th entered into a contract and all the evidence so indicates. Appellee's vice-president and project manager testified:

".  .  . Invitations to bid the plumbing work were sent to three contractors on February 18, 1970. When this letter was sent, Kendall, Inc. did not receive any plans or specifications so no cost estimate could be submitted from Kendall, Inc. to Martin K. Eby Construction Co. Kendall's proposal to do the work on a cost plus basis not to exceed a set dollar amount was accepted by letter of March 3, 1970."

Kendall's corporate secretary and engineer testified first as to the formal signed contract dated June 15, 1970, then as follows:

"Q. And the amounts are different, aren't they, sir?

"A. Yes.

"Q. Do you have any information concerning why those amounts are different?

"A. Yes.

"Q. Will you tell us what it is?

"A. Well, we made the proposal and I actually think the proposal was accepted. We had the job. And to the best of my knowledge, Jim Grier [Eby's vice-president and project manager] called and I believe he thought it was in the best interests of the job, the lowest price of the job, for these people to do the excavation.

"Eby took out of our bid the cost of machine excavation and $600.00 for sand.

. . . . . . . . . . . .

"I was the author of the June 5, 1970, letter to Martin K. Eby Construction Co. I delivered the letter to Mr. Grier on June 5, 1970 and Mr. Grier indicated he accepted the dollar amount of the bid in the June 5, 1970 letter. I feel Kendall, Inc. had the contract with Martin K. Eby Construction Co. on or before March 12, 1970. However, it was impossible to come up with a figure until June 5, 1970 because Kendall, Inc. did not have a copy of the plans and specifications. The submitted bid included the cost of excavation.

. . . . . . . . . . . .

"Q. Would you say that prior to March 12, 1970, that Martin K. Eby Company had accepted your bid on this job and that you had a negotiated contract?

"A. Yes, I think so.

"Q. And that all that was left to do was determine from the plans and specifications what the cost would be and how much material and supplies were to go into the building?

"A. Yes.

. . . . . . . . . . . .

"Q. Did you plan—On June 5, 1970, did you plan to actually do the excavation work yourself?

"A. You mean did we plan on—

"Q. Your people—physically doing the work?

"A. Oh, no.

. . . . . . . . . . . .

"We had the job before 5 June, 1970; then it was just a question of getting the job within the money. We had the job negotiated, and we had to come up with a figure Eby could live with. Our original proposal was made to Eby on 23 February, 1970; and Eby accepted us on the mechanical sometime before 12 March, 1970, I think.

. . . . . . . . . . . .

"I felt that as of 12 March, we had the mechanical job. If Eby was going to build the Kiva, we would get a contract from Eby; all that was left to be decided was how much the contract was going to be."

What about the matter of the change in figures due to the excavation work to be done by appellee? From the very beginning it

appears clear that appellee rather than Kendall was going to do this and it was so understood between them. The reason was explained by the deposition testimony: Kendall owned no backhoes and if it were going to do excavating it would have to rent one and include that charge and an operator's wages in its cost; Kendall would be entitled to a percentage add-on for this; appellee owned about fifty backhoes or pieces of excavating equipment; it was going to be required to keep a backhoe on the job site during construction in any event for which daily rental would be charged and paid for by Garvey in the total cost; this backhoe would not be used all the time but the rental would go on the same and it could easily be spared for excavation in connection with Kendall's mechanical work; under union agreement the backhoe operator could not be used for other types of work and if he were sent home for part of a day a full day's wages would still have to be paid; appellee would not profit from having another backhoe and backhoe operator on the job (the job site was crowded as it was) and it was in Garvey's interest from a cost standpoint that appellee do the excavating with the equipment already there; hence, appellee retained the excavation work and it was never contemplated otherwise between appellee and Kendall.

It seems clear the parties concluded they had entered into a binding contract with the specific maximum guaranteed cost to be submitted when the plans and specifications became available. In 1 Corbin on Contracts, § 29, it is stated:

"Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract." (pp. 94-95.)

This principle was adopted in *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.*, 212 Kan. 730, 512 P. 2d 379, in which we also held the fact that parties contemplate the subsequent execution of a formal instrument as evidence of their agreement does not necessarily imply they have not already bound themselves to a definite and enforceable contract.

On March 12th Kendall explained how it figured its cost basis. All that remained was for Kendall to determine the materials needed when the plans and specifications were made available and compute the maximum cost. Kendall actually began work on the project in the middle of May and had done a considerable amount prior to appellant's accident. As appellee points out this is not

without significance as a factor indicating the parties were contractually bound prior to June 12th. In Corbin, *supra,* it is stated:

"The court will be more ready to find that the apparently incomplete agreement was in fact complete and required the payment and acceptance of a 'reasonable' price or a performance on 'reasonable' terms, in case the parties have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement. The fact that they have so acted is itself a circumstance bearing upon the question of completeness of their agreement." (p. 93.)

Following receipt of the plans and specifications Kendall submitted its maximum cost on June 5, 1970. Although this figure included the cost of excavation the parties had understood from the beginning that upon appellee doing the excavating that cost would be deducted from Kendall's submitted maximum cost. Upon the undisputed facts before the trial court it properly concluded as a matter of law that all essentials had been agreed upon and appellee and Kendall intended to and did in fact enter into a binding contract prior to June 12, 1970. Rendition of summary judgment was proper.

We turn now to appellant's alternate theory of recovery—that if it be held a contract existed between appellee and Kendall, that agreement was such that Kendall became the general or prime contractor while appellee became the subcontractor, and appellant as an employee of the general contractor can maintain a tort action against appellee as the subcontractor. He says in his brief:

"K. S. A. 44-503 (a) precludes, in effect, common law actions 'up the ladder of employment', i. e., an employee of a subcontractor cannot maintain a common law damage action against his employer's employer. However, the statute does not bar an action by an employee of a prime contractor, or 'principal' as he is referred to in K. S. A. 44-503 (a), against his employer's subcontractor. [See, e. g., *Davison v. Eby Construction Co.,* 169 Kan. 256, 218 P. 2d 219 (1950) wherein the Court states an injured employee may maintain a common law action for damages against a subcontractor of the workman's employer.] The effect is that although a workman cannot 'sue up the employment ladder' he can sue down that ladder."

Appellant's argument further is that the purpose of 44-503 (*a*) is to insure workmen's compensation to the injured workman and where workmen's compensation has in fact been paid, as here, the statute is satisfied and its operation should not be extended beyond that purpose to abrogate his right to a common law action. He would have appellee wearing two hats—one as general contractor and the other as sub-subcontractor on the same contract. The facts

here do not admit such an alternative. There was only one contract. Much of that which has already been said is applicable. The parties simply never contemplated or intended a sub-subcontract. Kendall was never awarded the excavation work and it could not subcontract out something appellee had retained for itself.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.