No. 49,191

CARE DISPLAY, INC., *Plaintiff-Appellee*, v. DIDDE-GLÀSER, INC., *Defendant-Appellant.*

(589 P.2d 599)

Opinion filed January 20, 1979.

*Thomas A. Krueger,* of Krueger & Shaw, of Emporia, argued the cause and *W. Irving Shaw,* of the same firm, was with him on the brief for appellant.

*David H. Heilman,* of Council Grove, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Defendant, Didde-Glaser, Inc., appeals from a jury verdict of $17,440, for breach of an oral contract, in favor of plaintiff, Care Display, Inc. Defendant denied the existence of a contract and alleged in the alternative that if an oral contract was found to exist recovery thereon was barred by the statute of frauds.

The factual situation was extremely complex and will be set forth in some detail.

Care Display, Inc., located in Morris County, specializes in the design and construction of trade show exhibits for use at conventions, trade shows, fairs and similar exhibitions where merchants, manufacturers, producers and others display their products and services. Allan Hastings, president of Care Display, was the principal person representing Care Display. Didde-Glaser, Inc., located at Emporia, Lyon County, manufactures and sells printing presses and collators and frequently exhibits its wares at industrial trade shows. Various employees of Didde-Glaser, including Bob VanSickle, Advertising and Sales Promotion Manager until April or May, 1974, William D. Vancelette, Sales Manager, Howard W. Fanset, successor to VanSickle, and Lloyd A. Utley, Jr., Marketing Division Manager, were involved at one time or another in the negotiations and dealings with Care Display. Didde-Glaser had developed a new product it wanted to introduce at a trade show, to be held in Chicago, known as "Print '74," which was to be the largest graphic arts trade show ever conducted in the United States. Didde-Glaser had done business with Care Display on at least three prior occasions.

In the fall of 1973, VanSickle of Didde-Glaser contacted Hastings about the design and construction of a display booth to be used at the "Print '74" show to be held in November, 1974. These same two individuals had dealt with each other on prior occasions when Didde-Glaser utilized the services of Care Display. Between November, 1973, and May, 1974, VanSickle and Hastings had numerous conversations relative to the design and construction of the display booth. Costs, size, lighting, various design concepts, products to be displayed and other technical matters were discussed. The first written communication between the parties appears to have occurred May 3, 1974, when Hastings submitted a written proposal including a proposed design at a cost to Didde-Glaser of $46,907.00. Hastings testified that between May 3, 1974, and May 17, 1974, he received a telephone call from VanSickle in which costs, changes in the May 3rd proposal and other items were discussed, including whether Care Display actually had a contract with Didde-Glaser. Hastings testified VanSickle assured him that he had cleared things with his superiors and Care Display had a contract. There was no written confirmation of this conversation. About this time, the date being indefinite, VanSickle left the employment of Didde-Glaser to be succeeded by Fanset. It appears to be undisputed that at the time VanSickle had his May, 1974, conversation with Hastings numerous details in connection with the project were still undecided, including the cost, although all of the various cost proposals and discussions were within the original budget estimate specified by Didde-Glaser. On May 17, Hastings met with Vancelette to review additional proposals, various alternatives, materials and three different cost packages. On June 28, Fanset wrote Hastings enclosing specifications as a guideline for the proposed display booth and in his letter invited Care Display to submit a bid for the job. It appears the same guidelines and request for bids were sent to several other exhibit makers. On July 9, Hastings wrote Vancelette stating his surprise at the turn of events and indicating he felt Care Display had a firm contract and had been misled. Care Display asked for payment of their expenses to date, pointed out the work and effort already done, and also indicated the desire to proceed with completion of the project. On August 7, Fanset wrote Hastings advising the job was being given to another company located in Chicago, August 12th,

Hastings wrote Utley pointing out the commitment from Van-Sickle and asked for a further meeting. On September 3rd, a meeting was held which included Hastings from Care Display and Utley, Fanset, Vancelette, and possibly others from Didde-Glaser. VanSickle, no longer being with Didde-Glaser, was not present at the meeting and did not testify at the trial. At this meeting, Hastings submitted a revised proposal based upon Didde-Glaser specifications. Although the evidence is conflicting, Hastings testified he came away from the September 3rd meeting with the understanding Care Display had the contract. Didde-Glaser officials testified they had acknowledged to Hastings they liked the Care Display proposal but contended he was told any contract would be subject to certain conditions which would be forwarded by mail. September 6th, Fanset wrote Hastings setting forth certain conditions which were acceptable with one exception. Didde-Glaser contends they had become concerned because Care Display employed non-union labor and might not be allowed to install the display in Chicago. As a result, Didde-Glaser required a $250,000.00 performance bond to cover anticipated losses if Care Display did not fully perform. Care Display could not meet this new condition as the premium cost of such a surety bond was prohibitive. Didde-Glaser gave the job to another firm and on October 2nd, Hastings made a demand upon Utley for the sum of $17,440.00 damages for breach of contract and subsequently Care Display filed suit to recover that amount. The jury found in favor of Care Display for the full amount of the prayer and Didde-Glaser appeals.

Appellant's first point is that the trial court erred in failing to sustain defendant's motion for a directed verdict at the close of plaintiff's evidence and at the conclusion of the trial.

It is appellant's contention that while extensive negotiations took place over a considerable length of time, there was never a meeting of the minds on the terms necessary to constitute a contract. In support of its position Didde-Glaser points out evidence it contends shows a failure of the parties to reach agreement, including the lack of follow-up confirmation of the Van-Sickle-Hastings May, 1974, telephone call; the failure of Hastings to mention the VanSickle call to other Didde-Glaser people; the subsequent submission of numerous plan changes and cost figures; lack of agreement on price and quantity; the lack of a

written agreement and the letters from Didde-Glaser in the summer of 1974 soliciting bids from various companies, including Care Display. On the other hand, Care Display points out that Hastings and VanSickle had dealt on an oral basis on previous occasions, although there was usually some written confirmation in the form of a letter or invoice; the statements of VanSickle in the May, 1974, telephone conversation; the statements of various Didde-Glaser people at the September 3rd meeting; the numerous presentations of proposed displays with models and supporting documents presented by Care Display indicating actual work on the project rather than mere negotiation. In reference to the May telephone conversation Hastings testified:

Q. Mr. Heilman: "Don't go into your concern, what your thinking was, I asked you to tell the Court and jury what you said and what he said."
A. Mr. Hastings: "Well, specifically, I asked him if we did in fact have a contract to design, fabricate and construct the exhibit."
Q. Mr. Heilman: "And what did he say?"
A. Mr. Hastings: "He said, 'Yes'."

In defining a contract, this court stated in *Greiner v. Greiner,* 131 Kan. 760, 293 Pac. 759 (1930), at page 764:

"A promise for breach of which the law gives a remedy, or recognizes as creating a legal duty, is a contract. The promise need not be in any crystallized form of words: 'I promise,' 'I agree,' etc. Ritual scrupulousness is not required and, generally, any manifestation, by words or conduct or both, which the promisee is justified in understanding as an expression of intention to make a promise, is sufficient. . . ."

It has also been held that a binding contract may be reached even though there are matters remaining to be negotiated.

"Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract." *Storts v. Eby Construction Co.,* 217 Kan. 34, Syl. ¶ 2, 535 P.2d 908 (1975).

See also *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, 512 P.2d 379 (1973).

In order for parties to form a binding contract there must be a *meeting of the minds* as to the essential terms of the contract. *Steele v. Harrison,* 220 Kan. 422, Syl. ¶ 2, 552 P.2d 957 (1976); *Storts v. Eby Construction Co.,* 217 Kan. 34, Syl. ¶ 1; *Weil & Associates v. Urban Renewal Agency,* 206 Kan. 405, Syl. ¶ 4, 479 P.2d 875 (1971).

In the final analysis, the determination of the existence of a contract is a question of fact. *Steele v. Harrison,* 220 Kan. at 428-429. While the evidence in this case was highly conflicting, the jury evidently chose to accept the plaintiff's version of the facts and not that of defendant. It is not our function to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact and our only concern is with evidence which supports the trial court's findings, and not with evidence which might have supported contrary findings. *Steele v. Harrison,* 220 Kan. 422.

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for a directed verdict. (Following, *Simpson v. Davis,* 219 Kan. 584, Syl. 3, 549 P.2d 950.)" *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977).

Although a different jury and a different court might have reached a different verdict and viewed the evidence more favorably to the defendant and adversely to the plaintiff, we cannot say the trial court committed error in finding sufficient evidence to allow the case to go to the jury or in overruling defendant's motions for a directed verdict.

For its second point, Didde-Glaser contends that if there was a sufficient meeting of the minds to form a contract, then the contract was one for the sale of goods, there was no sufficient writing to indicate a contract had been made, and the contract was therefore unenforceable by virtue of the statute of frauds as found in the Uniform Commercial Code. K.S.A. 84-2-201.

The pertinent part of K.S.A. 84-2-201 provides:

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . ."

Defendant presents numerous arguments in an attempt to bring the action within the purview of 84-2-201 but the principal question is whether this contract was one for the sale of goods or one for the furnishing of services. If it involved the sale of goods, the statute would apply; if the major thrust of the contract was for services, then the statute would not apply.

K.S.A. 84-2-105(1) states:

"(1) 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 84-2-107)."

The contract in question is one commonly referred to by writers on the Uniform Commercial Code as a "mixed contract" in that it contemplated furnishing both goods and services. The test to determine whether a mixed contract is one for the sale of goods within the statute or one for services outside the statute is stated in *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974), as:

"The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentially involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentially involved (*e.g.,* installation of a water heater in a bathroom)." p. 960.

The trial court, in its memorandum decision overruling defendant's motions, stated in part:

"The Court senses that there was sufficient evidence for the jury to have found that services, particularly inceptional and design services, were extremely important in this particular contract, with production and set-up being secondary, which insofar as the Court is able to ascertain would only be a partial test to determine whether or not goods or services were in contemplation. It's obvious to the Court that some concept and some design is involved in every manufacturing project where goods are involved. . . . [T]he statute of fraud does not make any difference in the outcome of this litigation."

Numerous cases have been before the courts where a mixed contract involving both goods and services was in issue. See UCC Case Digest, Sales §§ 2102.7, 2105.1; Bender's UCC Service, Duesenberg & King, Sales and Bulk Transfers § 1.03(1); 1 Anderson, UCC §§ 2-105:5, 105:7 (2d ed. 1970, 1978 Supp.). A careful review of cases from other jurisdictions reveals that each case must be determined on an individual basis and that broad statements of principles are of little assistance in deciding a particular matter. In the instant case, there is no doubt that the contract contemplated the production and installation at Chicago of certain "goods." But was that the predominant thrust of the contract? We think not. Numerous designs and models were

prepared by Care Display and the overriding concern throughout all the extensive negotiations was the development of an artistic or design concept while the actual physical production of the display booth and the materials to be used therein were incidental to the overall subject matter. Care Display was a firm involved in the engineering and creative design of exhibits and displays, a highly specialized field, and not in the day-to-day physical construction of the booths. True, the construction, transportation and installation of the display booth was a part of the contract between the parties but the major objective contemplated utilizing the knowledge and expertise of Care Display to create a unique setting in which to exhibit and promote to best advantage the products of Didde-Glaser.

"It is clear that where the contract is basically one for the rendition of services, and the materials are only incidental to the main purpose of the agreement, the contract is not one for the sale of goods under the UCC." *Gulash v. Stylarama, Inc.,* 33 Conn. Supp. 108, 364 A.2d 1221 (1975).

The contract, being principally for the rendition of services with the production of goods only incidentally involved, was not within the purview of the statute of frauds and it is not necessary that we consider further the various other arguments of the defendant attempting to bring it within the statute or those of plaintiff attempting to set forth exceptions taking it out of the statute. Having concluded that the contract was one principally for the furnishing of services, we concur with the trial court that the statute was not a factor in the determination of this case.

In its third point on appeal defendant urges error in the failure of the trial court to give certain requested instructions. Defendant requested four instructions pertaining to the intent of the parties to enter into a formal written contract.

The right to instructions was stated in *Simms v. Webb,* 219 Kan. 675, 549 P.2d 570 (1976) as:

"Where evidence is introduced in support of a party's theory of a case, he is entitled to an instruction explaining the issue framed under such theory. [Citations omitted.] The instructions given must be germane to the issues raised by the pleadings, and must be limited to those issues supported by some evidence." p. 676.

The answer and pretrial order raise no issue as to the necessity of a formal written document and the evidence, at best, did not support such a requirement. In fact, one of the defendant's own

letters included the statement, "[t]his letter shall serve as official authorization in lieu of a formal contract." In addition, there was undisputed evidence that on the three prior occasions the parties dealt together, no formal written agreement was contemplated or prepared. We find no error in the trial court's refusal to give the requested instructions.

Next, defendant contends the trial court committed error in giving instructions No. 11 and No. 8 to the jury. No. 11 read:

"A contract may be made in any manner sufficient to show agreement. It may be oral or written, or implied from the conduct of the parties. An agreement is sufficient to constitute a contract although the exact time of its making cannot be determined.

"The existence of an agreement may be from a combination of written instruments and the acts of the parties.

"Parties may agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiations, and such an expectation does not prevent the agreement already made from being an enforceable contract."

The first paragraph of the instruction is taken from PIK Civ. 2d 18.02 (1978), the second paragraph from *Reznik v. McKee, Trustee,* 216 Kan. 659, Syl. ¶ 8, 534 P.2d 243 (1975), and the third paragraph from *Storts v. Eby Construction Co.,* 217 Kan. 34, Syl. ¶ 2. The instruction as given is an accurate statement of the law and, based upon plaintiff's theory at the trial, the evidence warranted the instruction.

Instruction No. 8 related to the question of the scope of employment of an employee. During the trial the defendant had contended that VanSickle did not have the authority to contract on behalf of Didde-Glaser and that if he did do so, he was acting outside the scope of his employment. There was also evidence to the contrary. Instruction No. 8 was taken verbatim from PIK Civ. 2d 7.04 (1978) with the exception that the opening phrase of 7.04 which reads "One of the questions you must decide . . . ." was changed to "One of the questions you may have to decide . . . ." The instruction was proper and we find no error in the giving of both No. 11 and No. 8.

Appellant's next point is that the damages were based upon insufficient evidence and were speculative and excessive. Both parties rely on statements from *Vickers v. Wichita State University,* 213 Kan. 614, 518 P.2d 512 (1974). In *Vickers* we stated:

"As to evidentiary matters a court should approach each case in an individual and

pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. (McCormick, Law of Damages, § 29 [1935].) It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. [Citation omitted.]" p. 620.

The record reflects sufficient competent evidence to support the award of damages made by the jury.

Appellant next contends there was no proper venue in Morris County. The question was raised by a motion prior to trial and the court made the following findings of fact:

"1. Plaintiff and defendant, a domestic corporation, have done business prior to the questioned contract in Morris County, and were doing business in Morris County at a time after the alleged contract came into existence and when it was allegedly breached.

"2. Plaintiff and defendant negotiated regarding the questioned contract in both Lyon and Morris Counties.

"3. The questioned contract was to be partly performed in Morris County and the balance was to be performed out of the State of Kansas.

"4. Whether the questioned contract was in existence or not, the claimed acts constituting breach thereof occurred in Morris County.

"5. Defendant's letter dated Sept. 24, 1974, was conceived, written and placed in the United States Mail in Lyon County and was received by defendant in Morris County.

"6. Defendant has failed to sustain its burden of proof to prove venue does not lie in Morris County."

The record adequately supports the findings of the trial court.

Appellant's final point questions the authority of VanSickle to bind Didde-Glaser to a contract. Assuming the jury's verdict was based upon a determination that the VanSickle-Hastings May, 1974, telephone conversation created the contract, the determination of VanSickle's authority was one of fact for the jury. The evidence as to his authority to bind Didde-Glaser to a contract was conflicting and there was sufficient evidence to support such a finding.

The judgment is affirmed.