(996 P.2d 365)
No. 81,334

St. Francis Mercantile Equity Exchange, Inc., *Appellee*, v. Pete Newton, *Appellant*.

Opinion filed February 11, 2000.

*Michael J. Day*, of Kite & Day, L.L.P., of St. Francis, for the appellant.

*James M. Milliken*, of James M. Milliken, Chartered, of St. Francis, for the appellee.

Before Elliott, P.J., Pierron and Knudson, JJ.

Pierron, J.: Pete Newton appeals a judgment for $33,140 entered in favor of St. Francis Mercantile Equity Exchange, Inc. (Exchange). Newton argues the trial court erred in finding that he was subject to in personam jurisdiction in Kansas and that the parties had an enforceable oral contract for the sale of 40,000 bushels of corn.

The Exchange is a farmer-owned cooperative which owns a grain elevator and deals in the buying and selling of grain, fertilizer, fuels, feed, and seed. The Exchange's primary place of business is St. Francis, Kansas, with a branch location in Haigler, Nebraska. At the time of the events in this case, the Exchange was purchasing grain from approximately 300 producers, primarily in Kansas, Nebraska, and Colorado.

In 1995, Newton was 29 years old and engaged in the business of farming and ranching in Eckley, Colorado, which is not far from St. Francis. Newton is not a member of the Exchange. Newton is a sole proprietor but previously engaged in a partnership farming operation involving his father and three brothers. He had been involved in the family farming operation virtually all of his life. This

operation consisted of raising alfalfa, wheat, corn, beans, and cattle. Newton helped in all aspects of the farm, although his primary responsibility was to oversee the calving of the cow herd and perform service and maintenance on machinery, equipment, and irrigation systems. He did not participate in the marketing of the grain production.

Newton terminated his relationship with the partnership in 1994 and became a sole proprietor. He raised sunflowers, hay, and corn that year, and did his own marketing of the crops produced. In 1995, Newton farmed approximately 850 acres of irrigated land and raised approximately 520 acres of corn.

On April 13, 1995, Newton initiated contact with the Exchange by telephoning the principal place of business in St. Francis. He made two phone calls on April 13, 1995, speaking both times to Mike Ketter, a grain merchandiser, agent, and employee of the Exchange. Prior thereto, Newton never had any dealings with Ketter and the only contact he had with the Exchange was small cash fuel and supply purchases at the branch in Haigler, Nebraska. The first telephone call from Newton to Ketter was for the purpose of pricing corn to be delivered at harvest time in 1995. Newton indicated he offered to sell approximately 40,000 bushels of corn to be picked up at his fields. Ketter quoted Newton with a price of $2.45 per bushel of corn.

Newton contacted the Exchange again later that day and again talked with Ketter. Newton stated he wished to sell 40,000 bushels of corn at the price of $2.45 per bushel. Ketter advised Newton that the price of corn had fallen throughout the day and the price was now $2.43 per bushel. Ketter testified Newton agreed to sell 40,000 bushels of corn to the Exchange at $2.43 per bushel.

The Chicago Board of Trade was at or near closing at the time of the second telephone conversation. When the market opened, the Exchange sold eight December corn contracts at a price of $2.6075 representing the 40,000 bushels it had purchased from Newton. The futures price closed on April 13, 1995, at $2.61 per bushel for December corn contracts and a basis of $.18 per bushel was subtracted, leaving a cash price of $2.43 per bushel.

It is the well-established policy of the Exchange and other similar cooperatives to not speculate on grain prices. The customary practice is for the Exchange to immediately take a position in the futures market equivalent to the amount of grain it purchased in order to protect its contracts. The price of corn went up substantially between April 1995 and November 1995.

Newton testified that he did not believe the oral contract of April 13, 1995, was binding and expected to receive a written contract following his conversations with Ketter. Ketter testified that he mailed a confirmation of the agreement to Newton immediately after the second telephone conversation on April 13, 1995. Newton claimed he did not receive this immediate confirmation. Newton testified that he contacted Ketter in May 1995 to inquire as to the status of the contract since he had not received the confirmation/contract in the mail. Newton indicated that he received a confirmation from the Exchange during late June or early July, but that he never signed nor returned it.

Newton did not respond to the confirmation or talk to anyone at the Exchange until October 9, 1995, when he was contacted by Ketter on the phone. Ketter testified that Newton said his crop had been hailed and he was not going to be able to deliver under the contract. Additionally, Ketter said that Newton informed him that the parties did not have a written contract and that he had not signed the confirmation, and, therefore, there was no binding agreement. However, in 1995, Newton sold in excess of 90,000 bushels of corn.

On October 12, 1995, Ketter sent Newton a letter, return receipt requested, advising him of his options in canceling the contract. Ketter gave Newton three options: (1) cancel the contract and pay the difference between the then existing futures contract and the contract futures price under which the $2.43 per bushel was established; (2) roll the contract over to next year's crop, reducing the 1996 new crop corn price by the amount of the loss; or (3) fulfill the contract by purchasing corn from another person or business to fill the 40,000 bushel contract. Ketter contacted Newton on November 13, 1995, to find out Newton's decision. Newton acknowledged receipt of the letter, but refused any of the options.

He told Ketter that because the contract was an oral contract over the phone and since he never signed the contract, it was not binding and he did not intend to perform.

Following Newton's stated intention to not perform the contract, on November 20, 1995, the exchange purchased eight contracts of December corn at a price of $3.2825, creating a loss of $0.675 per bushel for a total of $27,000. The Exchange also suffered a loss of $.15 per bushel on 40,000 bushels of corn amounting to $6,000, representing the margins the Exchange would have made from handling the grain if Newton had not failed to deliver. The Exchange also had brokerage fees of $140.

On January 22, 1996, Newton met with the Exchange's Board of Directors in St. Francis to discuss whether a contract existed. Newton arranged this meeting. The parties were unable to resolve the issue. The Exchange sued Newton in district court on March 28, 1996. After a trial to the court, judgment was entered against Newton in the amount of $33,140. Newton appeals.

First, Newton argues the trial court erred in finding that he was subject to in personam jurisdiction in Kansas.

Whether the district court has jurisdiction is a question of law over which this court has unlimited review. *Grindsted Products Inc. v. Kansas City Power & Light Co.*, 21 Kan. App. 2d 435, 437, 901 P.2d 20 (1995).

In denying Newton's motion to dismiss for lack of personal jurisdiction, the trial court found that the telephone call by Newton to the Exchange on April 13, 1995, during which matters were discussed that eventually led to the Exchange filing this lawsuit, "in and of itself constitutes minimum contact with this state and is sufficient for this Court to extend in personam long-arm jurisdiction pursuant to both K.S.A. 60-308(b)(1) and 60-308(b)(5)." The trial court also found that the exercise of jurisdiction over Newton did not offend the due process clause of the Fourteenth Amendment.

K.S.A. 60-308(b)(1) and (b)(5) state that any person, whether or not a resident of Kansas, submits to the jurisdiction of this state for any cause of action arising from the transaction of any business within the state or from entering into an express or implied contract

with a resident of this state, by mail or otherwise, to be performed in whole or in part by either party in this state.

In order to satisfy due process requirements in exercising in personam jurisdiction, minimum contacts must exist between the defendant and the forum state. *Davis v. Grace*, 4 Kan. App. 2d 704, 709, 610 P.2d 1140 (1980) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 62 L. Ed .2d 490, 100 S. Ct. 559 [1980] ). The test for determining whether minimum contacts exist is well established in Kansas case law. It is set forth in *White v. Goldthwaite*, 204 Kan. 83, 88, 460 P.2d 578 (1969).

"[T]here are three basic factors which must coincide if jurisdiction is to be entertained over a nonresident on the basis of transaction of business within the state. These are (1) the nonresident must purposefully do some act or consummate some transaction in the forum state; (2) the claim for relief must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. [Citations omitted.]"

Kansas appellate courts have consistently found that the Kansas long-arm statute is to be liberally construed to assert personal jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Misco-United Supply, Inc. v. Richards of Rockford, Inc.*, 215 Kan. 849, 851, 528 P.2d 1248 (1974); *Environmental Ventures, Inc. v. Alda Services Corp.*, 19 Kan. App. 2d 292, 295, 868 P.2d 540 (1994).

Newton relies on *Misco-United*. There, the plaintiff, a Kansas corporation with its principal place of business in Wichita, sold the defendant, an Illinois corporation, five tank liners. The court declined to find that Kansas had personal jurisdiction over the defendant corporation consistent with the due process provisions of the Fourteenth Amendment, because the defendant lacked sufficient contacts with the state. The court emphasized that the entire performance of the contract occurred outside of Kansas. No manufacturing was performed in Kansas and none of the goods in ques-

tion were ever brought into the state. Furthermore, none of the defendant's personnel had ever been here. The only actual contact of the defendant with Kansas was a phone call to plaintiff in Wichita to place its order. "In effect, plaintiff corporation merely acted as a clearing-house for what was essentially an out-of-state transaction." 215 Kan. at 854.

Additionally, the *Misco-United* court could not find that the defendant purposefully availed itself of the privilege of conducting any activity here. The mere placing of an order for goods by phone with a Kansas resident was insufficient to invoke the benefits and protections of Kansas law. Finally, the court observed that no substantial hardship would result from denying jurisdiction. 215 Kan. at 854-55.

The Exchange relies on *Environmental Venture*. There, the court found that a defendant corporation transacted business within the state of Kansas sufficient to satisfy both K.S.A. 1993 Supp. 60-308(b)(1) and the constitutional due process guarantees through contacts that included facsimile transmissions, telephone conversations, receipt of funds from Kansas, and transfer of the bill of sale to the plaintiff in Kansas. 19 Kan. App. 2d 292, Syl. ¶ 3.

This case appears to fall between the two cases noted above. We find the trial court did not err in subjecting Newton to in personam jurisdiction in Kansas under both K.S.A. 60-308(b)(1) and (b)(5). Under the former, " 'business' is transacted within the state when an individual is within or enters this state in person or by an agent and, through dealing with another within the state, effectuates or attempts to effectuate a purpose to improve his economic conditions and satisfy his desires." *Volt Delta Resources, Inc. v. Devine*, 241 Kan. 775, 778, 740 P.2d 1089 (1987). "The transaction of business exists when the nonresident purposefully does some act or consummates some transaction in the forum state." *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 467-68, 819 P.2d 1192 (1991).

Under subsection (b)(5) ("entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state"), the

scope of K.S.A. 60-308 is broadened to extend the reach of Kansas' long-arm statute. "This type of statute is commonly referred to as a 'single act' statute in that it permits the exercise of personal jurisdiction over a nonresident defendant based solely on the making or performance of a single contract within the state." *Misco-United,* 215 Kan. at 851.

The facts in this case satisfy the three-part test set forth in *White,* 204 Kan. at 88 (contacts, damage causation, and notions of fair play/substantial justice), for subjecting Newton to jurisdiction in Kansas. Newton's contact with the Exchange was not limited to the two phone calls on April 13, 1995. We agree with the court's reliance on the fact that Newton purposefully initiated formation of the contract by contacting Ketter at the Exchange in St. Francis. However, Newton also knew the Exchange's principal place of business was St. Francis and that any claim arising out of the contemplated contract would arise in Kansas. Newton called St. Francis to twice initiate the contract. He testified that he called the Exchange again in May 1995 to check on the contract, and he arranged a meeting with the Exchange's Board of Directors *in St. Francis* when the parties could not agree as to the existence of an enforceable contract.

Next, Newton argues the trial court erred in finding the parties entered into an enforceable contract. Newton contends the statute of frauds prevents recovery on the oral contract and that the exception set forth in K.S.A. 84-2-201(3)(b) should not remove the bar of the statute.

The question of whether a binding contract was entered into depends on the intention of the parties and is a question of fact. *Reimer v. The Waldinger Corp.,* 265 Kan. 212, 214, 959 P.2d 914 (1998); *Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 60, 643 P.2d 100 (1982). Our standard of appellate review requires us to decide whether the district court's finding of an enforceable contract is supported by substantial competent evidence and whether the findings are sufficient to support the conclusions of law. See *Tucker v. Hugoton Energy Corp.,* 253 Kan. 373, Syl. ¶ 1, 855 P.2d 929 (1993). We do not weigh conflicting debatable evidence, pass on the credibility of witnesses or redetermine questions of fact.

Our only concern is with evidence that supports the district court's findings, not with evidence that arguably might have supported contrary findings. *Care Display Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 237, 589 P.2d 599 (1979).

However, interpreting the various provisions of the statute of frauds is a question of law and our review is unlimited. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

The trial court ruled the statute of frauds was applicable, but that the exception found in K.S.A. 84-2-201(3)(b), a party's admission as to the agreement, controlled to create a binding agreement. The statute of frauds in K.S.A. 84-2-201(1) provides that a contract for the sale of $500 or more worth of goods is not enforceable unless it is in writing and is signed by the party against whom enforcement is sought. However, K.S.A. 84-2-201(3)(b) provides an exception to this rule based on an admission by the party seeking protection under the statute of frauds:

"A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . .

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted."

Kansas Comment 6 to K.S.A. 84-2-201(3)(b) provides further explanation:

"Under paragraph (3)(b), a party that admits in court—by pleading, stipulation, deposition, or otherwise—that a contract was made may not rely on the statute of frauds as a defense. See Wending v. Puls, 227 K. 780, 610 P.2d 580 (1980). Both voluntary and involuntary admissions qualify. For this exception to apply, the party need not admit making an oral contract. Instead, it is sufficient that the party's words or admitted conduct reasonably lead to that conclusion. See Quaney v. Tobyne, [236 K. 201, 689 P.2d 844 (1984)]. The contract is enforceable only to the extent of any quantity admitted."

In *Quaney v. Tobyne*, 236 Kan. 201, 689 P.2d 844 (1984), the court explained the rationale behind creating an exception to the statute of frauds based on a party's admission of a contract. First, the exception prevents a party from admitting the existence of an oral contract for the sale of goods and simultaneously claiming the

benefit of the statute of frauds. Second, it prevents the statute of frauds from becoming an aid to fraud. Last, K.S.A. 82-2-201(3)(b) expands the exceptions to the nonenforceability of oral contracts under the statute of frauds. 236 Kan. at 207.

The trial court based its ruling under K.S.A. 84-2-201(3)(b) on Newton's deposition testimony. Newton testified in deposition that he agreed to sell 40,000 bushels of corn at $2.43 delivered at Newton's field and that both he and the Exchange would be bound by the agreement. Our standard of review is limited to whether there is substantial competent evidence to support the trial court's decision.

In *Quaney*, a situation similar to the present case occurred involving the sale of cattle. In *Quaney*, the defendant argued that the parties never had a meeting of the minds on the sale and purchase of the cattle, and that no binding contract was to come into existence until a formal, written agreement had been prepared and signed by both parties. The court held:

"From our analysis of this testimony, we have concluded that, although the defendant did not openly and frankly admit to an oral agreement, his testimony sufficiently establishes that an oral agreement existed. The defendant acknowledged all the principal terms of the agreement. The parties had agreed on a price per pound, type and quality of the cattle, place of loading, place of weighing, and the down payment. Although the defendant never paid the down payment or drew up a written contract as he volunteered to do, we hold that his testimony contained admissions of his statements and actions sufficient to satisfy the requirements of K.S.A. 84-2-201(3)(b)." 236 Kan at 211-12.

After synthesizing extensive caselaw and various authorities, the *Quaney* court set forth the following principle of law:

"[T]he exception to the statute of frauds contained in K.S.A. 84-2-201(3)(b) is satisfied when the party who has denied the existence of an oral contract in reliance on the statute takes the stand and, without admitting explicitly that a contract was made, testifies as to his statements or his actions which establish the terms of the oral contract claimed by the opposing party. It is not necessary that there be an express declaration in which the party admits the making of the oral contract. It is sufficient if his words or admitted conduct reasonably lead to that conclusion." 236 Kan. at 210.

We find there is substantial evidence to support the trial court's decision that even though Newton testified at trial that he felt he

was not obligated until he signed a written contract, his deposition testimony indicated there was a meeting of the minds concerning the quantity, price, and place of delivery. We agree with the trial court that the Exchange had an enforceable contract, that Newton admitted to the terms of the contract, and that the Exchange, therefore, was entitled to its damages for Newton's breach of the contract.

Affirmed.