No. 48,041

LARRY STEELE and MAX STEELE, d/b/a STEELE FARMS, *Appellants,* v.
PAUL E. HARRISON, D. D. S., *Appellee.*

(552 P. 2d 957)

Opinion filed July 23, 1976.

*J. D. Muench,* of Scott City, argued the cause and was on the brief for the appellants.

*Keen K. Brantley,* of Wallace, Brantley & Shirley, of Scott City, argued the cause, and *James W. Wallace* and *John Shirley,* of the same firm, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: This action is for specific performance of an agreement to convey farm land in Greeley County, Kansas. After a trial to the court it was held no binding agreement had been consummated and specific performance was denied. Plaintiffs have appealed.

The primary question on appeal is whether there is evidence in the record to support the findings and conclusions of the trial court.

. On appeal it is not the function of the appellate court to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact. The reviewing court is concerned only with evidence which supports the trial court's findings, and not with evidence which might have supported contrary findings. (*Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 256, Syl. 1, 531 P. 2d 428; *Landrum v. Taylor,* 217 Kan. 113, 535 P. 2d 406.) With these principles in mind we turn to the facts which gave rise to the controversy.

Larry and Max Steele own a farm in Greeley County, Kansas, and operate in partnership. Dr. Paul Harrison of Stafford, Kansas, owns other farm land in that same county. Harrison, a non-resident landowner, had been leasing his land to a farm tenant on a crop-share basis. In January, 1973, Larry Steele wrote to Harrison and expressed an interest in Harrison's land. He advised that the Steeles were interested in trading certain Stanton County land owned by them for the Greeley County land owned by Harrison.

In February, 1973, Harrison replied to Steele's letter and expressed an interest in trading his land in Greeley County, but he wanted land in either Greeley, Hamilton, Wichita, Kearny, Gray or Ford County, not in Stanton County. Harrison received an immediate reply from Steele advising that the Steele brothers would begin looking for land to purchase which might be suitable for trade.

Early in April, 1973, the parties met in a coffee shop at Tribune, Kansas, to discuss the proposed land transaction. Harrison testified at the trial that he and Larry Steele met at Tribune and discussed trading land. At that time he explained to Steele that he was only interested in a trade because his land in Greeley County had a low tax base and in event of a sale he would incur a heavy tax liability. Harrison suggested that the Steeles work with the Stanley Realty

Agency in Syracuse, Kansas, to locate suitable land for trading purposes.

On April 9, following the meeting in Tribune, Steele write a letter to Harrison which in pertinent part reads as follows:

"We would be willing to make a bonafide offer on Sec. 16-17-42 Greeley Co. Kans. of $65,000 providing we would get immediate possession. Of course this is more than the auctions of land almost adjoining the land last spring and summer which were 78.00 & 86.00 in Sec. 8 NW of this section & 1 qtr. ½ mile east. But as I stated this land adjoins us and we realize that possession is important. I assume the wheat share is ⅓.

"I have not made further contact with the Stanley Agency at Syracuse as they were not in the office. Will contact you as soon as I find out anything. . . ."

We note that this offer to purchase Harrison's section of land in Greeley County was conditioned upon Harrison giving the Steeles immediate possession. It also appears that the Steeles would expect to receive the landlord's one-third share of the wheat crop growing on the land.

On receipt of Steele's letter Harrison replied:

"Received your letter this morning and I guess I wasn't definite enough when talking to you. Richard Vester has a lease expiring Aug. 1st, 1973. He has already said he was selling out and wanted the buyer of his equipment, to be able to continue. However I told them when they were here that the land was for sale, and that if it were sold the buyer would take over, the summer fallowed ground immeadiately and the wheat ground after harvest.

"I will sell to you at price of $65,000.00 possession of open ground immeadiately and the wheat ground Aug 1st. 1973, me to retain the land lords interest in growing wheat.

"Please let me know soon as I will want to notify Mr Henry Robertson and His father in law C. P. McKinney.

"If you hear anything more from Stanleys Agency Please let me know."

As we read this letter it is not an acceptance of the offer contained in Steele's letter of April 9, but is in effect a counter-offer. The price was to remain the same but Harrison was to retain the landlord's share of the growing wheat and the wheat ground was not to be delivered to Steele until August 1, 1973. In addition, the last paragraph in the letter seems to indicate a rejection of Steele's offer for Harrison expressed a continuing interest in the previous negotiations for a trade of this land. "Stanley Agency" was the real estate firm in Syracuse which had been recommended by Harrison to help the Steeles locate suitable land to trade.

On April 12, Larry Steele responded with the following letter.

"Dr. Harrison,

"I received your letter today concerning your land. We would certainly appreciate your acceptance of our offer but we would want to get some income pretty rapidly if we were to pay that amount for the land. Maybe we could work out a deal where we could get some of the income so we wouldn't have taxes to pay before we realize any income from the land.

"I contacted the Stanley Agency at Syracuse and they have already sold the land in north Hamilton Co. but anticipate some more land to be on the market soon. They are to let me know when they do. I will call you so you can look at it when they do.

"As I stated we would like to get some income.

"I will let you be the judge of what is equitable and it would be alright to go ahead and make a contract for the section. I will enclose a check."

A check for $1,000 was enclosed with this letter, but we cannot say that this letter constituted an unqualified acceptance of Harrison's counter-offer. The letter refers to Steele's previous offer, not to Harrison's counter-offer. It reaffirms a need for current income from the land to pay taxes, which was not possible under Harrison's counter-offer, and it again refers to a possible trade of this land if and when the Stanley Agency at Syracuse found land for the Steeles to purchase and trade. If the Steeles considered the letter to be a final acceptance of Harrison's counter-offer, the reference to a possible trade in the future was entirely superfluous. Harrison would have been bound by the acceptance to sell for cash and would not have the land to trade at some future date.

No written contract of sale was prepared by Harrison. Instead he prepared a written lease on the land for a term of one year, terminating August 1, 1974. The Steeles accepted the written lease which called for one-third of all crops to be delivered to the landlord, Harrison. It further provided: ". . . Tenant agrees to give up possession to the above described land without notice at the expiration of this lease as stipulated above. . . ." The lease was dated April 17, 1973, and thereafter the county agricultural stabilization and conservation service office of Greeley County, pursuant to notice of change of farm operators, listed the Steeles as the operators and Harrison as the owner of this land for the crop year 1974. The notice of change of operator contains a mailing date of December 13, 1973.

The farm lease referred to above contained the following paragraph:

"Tenant further agrees that this lease in no way affects the agreement entered into by correspondence and telephone."

The meaning and purpose of this provision in the lease is obscure, and the parties during the trial ascribed their own meanings to the paragraph. Harrison testified the paragraph referred to negotiations for a trade of the land at some future date if suitable land could be obtained by the Steeles.

After the lease was entered into, Harrison mailed the abstract of title to this land to an abstractor in Tribune with instructions to bring the title up to date and make the abstract available to the Steeles for examination of the title.

In July, Harrison advised Steel that it was apparent they were not going to be able to complete a trade of the land. Harrison returned the $1,000 check to Steele and Harrison asked for return of his abstract of title. Steele did not have it in his possession at the time and apparently promised to give it to Harrison later.

The lease to the Steeles went into effect August 1, 1973, and the land was planted to wheat. Thereafter on December 10, 1973, an attorney for the Steeles prepared a contract for the outright purchase of this land and mailed the contract to Harrison along with a check for down payment in the sum of $1,000.

Three days later on receipt thereof Harrison responded to the attorney as follows:

"What do you think you are doing. I rejected this deal on the 4th, of July 1973. Returning to Larry Steele check which he had sent, just as you have without assurance that we could complete the deal.

"I have witnesses to all of our conversations, previous to any offer on this land and hinging entirely on our, either Mr Steele or myself finding some suitable land that they could buy and make the exchange.

"Larry Steele has repeatedly said he was returning the abstract to this land, that I loaned him, in case we were able to complete a deal that was then pending. If that abstract is not returned to me shortly, they are going to lose there lease on this land which expires Aug. 1st, 74 and you can so inform them."

Thereafter the relationship between the Steeles and Harrison continued to deteriorate and on January 19, 1974, Harrison notified the Steeles by certified mail that the lease would not be renewed and that they were not to prepare the land for planting the 1975 crop.

On July 19, 1974, Steele notified Harrison as to the location of the landlord's one-third share of the wheat crop which had been harvested and placed in elevators, totaling 4160 bushels. The Steeles refused to turn over possession of the land to Harrison and they again planted a wheat crop which would be harvested in 1975. The Steeles thereafter filed this action to compel Harrison to convey

the property to them. Issues were joined and evidence was presented to the trial court.

The plaintiffs (the Steeles) prosecuted their claim in the trial court on alternative theories. Their first theory was based upon a written contract for the purchase of the land for $65,000 as evidenced by the letters. Their second theory was based upon an oral agreement for the exchange of land which was to be completed at such time as suitable land could be purchased by the Steeles to complete the agreement. We are of the opinion that the trial court's findings and conclusions are adequately supported by the evidence and dispose of both theories advanced by the appellants.

The trial judge made detailed findings and conclusions. He concluded, "That no contract was entered into between the parties." He determined that the letters did not evidence a meeting of the minds on essential and material matters necessary to make a binding contract to convey the land. As to the negotiations for trade of this land for other land to be acquired by the Steeles, the judge determined that there was no time set for performance within a reasonable period and that the Steeles were not able to acquire any land for trade within a reasonable time. A reasonable time was determined by the judge to coincide with termination of the one year agricultural lease. In his findings the judge discussed the effects of the statute of frauds (K. S. A. 33-106) which provides no action shall be brought to charge a party upon any contract for the sale of lands, or upon any agreement that is not to be performed within the space of one year unless the agreement or some memorandum thereof shall be in writing and signed by the party to be charged therewith. The trial judge further reasoned that assuming there may have been a meeting of minds on the oral agreement to trade, there was no sufficient performance to take the case out from under the statute of frauds. The granting of possession was under the terms and upon the considerations stated in the farm lease. The check given by the Steeles as a good faith payment was never cashed, it was returned to the Steeles and accepted by them. As to the 1975 wheat crop planted by the Steeles, the trial court found the land had been cultivated and the crop had been planted after notice that the written lease would not be renewed and that no cultivation or planting should be attempted. The Steeles cultivated and planted the land thereafter at their own risk and they were not entitled to the land or the crop. Accordingly the trial court entered judgment for defendant on all issues.

In order for parties to form a binding contract there must be a meeting of the minds on all the essential terms thereof. (*Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.*, 212 Kan. 730, Syl. 1, 512 P. 2d 379; *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, Syl. 4, 479 P. 2d 875; *Topeka Savings Association v. Beck*, 199 Kan. 272, Syl. 2, 428 P. 2d 779.) To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract. (See 17 Am. Jur. 2d, Contracts, § 18, 19, pp. 354, 355; 17 C. J. S., Contracts, § 31, p. 635.)

The documents relied upon by appellants do not demonstrate an agreement between the parties to sell and purchase land. In his letter of "acceptance" Harrison did not agree to grant immediate possession nor did he accept the proposal to relinquish the landlord's share of wheat then growing. These provisions of appellants' "offer" were essential terms of the offer as demonstrated by Steele's letter of April 12. In addition the Steeles delivered the landlord's share of the crop to Harrison under the written lease.

It is fundamental that a communicated offer creates a power to accept the offer that is made, and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract. Unless the original offeror subsequently expresses unconditional assent to the counter-offer there will never be a contract. (*Seymour v. Armstrong*, 62 Kan. 720, 64 Pac. 612; 1 Corbin on Contracts, § 82, pp. 349-352 [1963].)

In the present case the Steeles did not accept the counter-offer proposed by Harrison. They expressed concern about receiving immediate income from the property and suggested that Harrison make an "equitable" contract. Additional evidence indicating an absence of a contract for sale appears in the record. The subsequent acceptance of a lease on the property and appellants' continued attempts to secure property which could be traded for the Harrison farm lends further support to the trial court's findings and conclusions. It cannot be said that the parties manifested mutual consent to terms of a contract for sale.

In an action based on contract, the burden of proof is on the plaintiff to show the existence of the contract alleged in the petition. (*Van Brunt, Executrix v. Jackson*, 212 Kan. 621, 512 P. 2d

517; *Commercial Credit Corporation v. Harris,* 212 Kan. 310, 510 P. 2d 1322.) The existence or non-existence of an agreement or contract is in its very nature a question of fact. (*Reznik v. McKee, Trustee,* 216 Kan. 659, 534 P. 2d 243.) The question was one for the trial court to resolve and there is sufficient evidence to support a finding that no contract was reached by the parties.

Two procedural matters should be discussed.

The first concerns the award of the 1975 wheat crop to Harrison. Initially this was specified in the record as one of the points relied on in this appeal. The Steeles claimed that either the 1975 wheat crop or the expenses of cultivating and planting the crop should have been recovered by them. This point does not appear in the appellants' brief and has not been briefed or argued. Points neither briefed nor argued on appeal will be deemed abandoned. See cases collected in Hatcher's Kansas Digest (Rev. Ed. Perm. Supp.), Vols. 1-3, Appeal and Error, § 184, p. 46.

The second procedural matter concerns permission to amend the answer to raise the affirmative defense, the statute of frauds. According to the date of the order, permission to amend was granted by the trial court ten days before trial began and it is argued the amendment was allowed without sufficient notice. The actual date the order was entered is in dispute but does not need to be resolved for our purposes.

The need for amendment arose in this manner. The petition for specific performance alleged a written contract. After answer was filed the defendant, Harrison, filed a motion for summary judgment which was argued on February 24. During the argument on the motion the plaintiffs for the first time disclosed that they were partially relying upon an oral agreement for the exchange of property. At this time the statute of frauds came into the picture and defendant orally requested permission to file a motion to amend the answer. Permission was granted. A written motion was not filed until April 3, and the order permitting the amendment is dated April 8. Subsequent to the filing of this motion the proceedings before the court, including the argument against the amendment, were transcribed. The date of these proceedings is not set forth in the record. The proceedings appear to have taken place shortly before the trial began, but in any event the trial court stated that the actual argument on the matter was on February 24, at the time the summary judgment was

heard. The court further stated that plaintiffs had ample warning that the affirmative defense would be allowed by amendment and this was done before trial.

The amendment was granted by leave of court. K. S. A. 1975 Supp. 60-215 provides after responsive pleading has been filed a party may amend his pleading after first obtaining leave of court or written consent of the adverse party. The statute directs that leave to amend should be freely given by the trial court when justice so requires, and that such amendments should be left within the sound discretion of the trial court. No error will lie from a trial court's order allowing an amendment to a pleading unless the adverse party can demonstrate prejudice resulting of such a nature as will justify the appellate court in finding the trial court abused its discretion. See *Trimble, Administrator v. Coleman Co., Inc.*, 200 Kan. 350, 358, 437 P. 2d 219, and cases cited therein. In *Commercial Credit Corporation v. Harris*, supra, (212 Kan. p. 312), it is held there was no abuse of discretion by the trial court or error when an answer was amended by leave of court to raise an affirmative defense on the morning of the trial. The observations in *Harris* are applicable here and the point raised by appellants is without substance.

Accordingly, the three points briefed and argued on appeal have been disposed of and the judgment is affirmed.