UNITED STATES FIDELITY &
GUARANTY COMPANY,
Plaintiff,

v.

Marsha BURRESS, Defendant.

No. 92–4027–RDR.

United States District Court,
D. Kansas.

Feb. 28, 1994.

Steven R. Fabert, Topeka, KS, for plaintiff.

Hal D. Meltzer, Gregory G. Schultz, Turner & Boisseau, Chartered, Overland Park, KS, Dan E. Turner and Phillip L. Turner, Turner Law Office, Topeka, KS, for defendant.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a diversity action brought by United States Fidelity and Guaranty Company (USF & G) seeking reformation of a settlement agreement entered into between the parties. Plaintiff contends that a mutual mistake was made in preparing and executing the settlement agreement. The court has conducted a trial and the parties have submitted proposed findings of fact and conclusions of law. The court is now prepared to rule.

*FINDINGS OF FACT*

1. In 1989, Marsha Burress filed suit in the District Court of Shawnee County, Kansas against Peppermint Twist Management Company, Inc. (PTMC). She sought damages for injuries she suffered on September 23, 1989 at the Peppermint Twist nightclub in Topeka, Kansas. Burress was one of several individuals who had been accidentally served a dishwashing liquid containing lye rather than a drink. She was represented in that lawsuit by Dan Turner and Phillip Turner, father and son. PTMC was insured by USF & G. USF & G hired James Nordstrom of the Fisher, Patterson, Sayler and Smith law firm to represent PTMC and USF & G in the lawsuits arising from the events of September 23, 1989 at the Peppermint Twist.

2. On September 9, 1991, several of the cases, including Burress' lawsuit, were set for trial. Prior to trial, the Burress parties had settlement discussions. On August 28, 1991, Dan Turner wrote Nordstrom and offered to settle his client's claim for $500,-000.00. On August 29, 1991, Nordstrom wrote Dan Turner and made a counteroffer of $200,000.00 in cash and approximately $150,000.00 to be placed in an annuity "tailored to your client's specifications." On September 5, 1991, Dan Turner rejected the most recent offer and indicated that his client "was not interested in an annuity provision." He proposed a counteroffer of $450,000.00.

3. C. Eugene Miller was the claim supervisor at USF & G handling the Burress claim. He became directly involved in the settlement negotiations in early September because Nordstrom had to leave town to attend a funeral.

4. On September 6, 1991, Miller faxed a letter to Dan Turner rejecting his offer and making a counteroffer of $375,000.00, of which $100,000.00 would have to be placed in an annuity with USF & G. Following receipt of Miller's fax, Dan Turner faxed another counteroffer to Miller, which proposed that Burress would settle her claims for $425,-000.00 with $100,000.00 of that amount to be placed in an annuity with the terms to be agreed upon by the parties. Miller made a counteroffer later that day to Dan Turner by telephone of $400,000.00 with $100,000.00 to be placed in an annuity. Miller confirmed this conversation with a later fax.

5. On the first day of trial, Dan Turner told Nordstrom that the offer was accepted. Nordstrom was unaware of the terms of Miller's offer at that time. Turner and Nordstrom agreed that the case was settled, and the claims of Burress did not proceed to trial on that date. The trial judge was informed that the case had been settled. Turner had express authority from his client to accept the offer when he did so on September 9, 1991.

6. Phillip Turner called Miller on September 9 and left a telephone message indicating that the Burress case had been settled for $400,000.00. A letter, prepared and signed by Phillip Turner, was sent to Miller

on September 9, 1991. This letter described the settlement as follows:

> Our client, Marsha Burress has accepted the offer to settle her lawsuit for $400,-000—payable by check (not draft) will be required. Marsha Burress elects to place $100,000.00 of this amount in an annuity with USF & G, with a starting date of today's date, payable four (4) years from today's date in monthly payments, for ten (10) years. We would like to close on Friday, September 13, 1991.

7. The four-year delay for payment of the annuity had been chosen because the Turners understood that Miller's office computer could not calculate annuity figures for an earlier payment date. The ten-year payout for the annuity was chosen by Burress after consultation with her attorneys.

8. Phillip Turner faxed another letter to Miller on September 11, 1991. Included with the letter was a proposed settlement agreement and release. The letter again stated the terms of the settlement agreement as follows:

> Included with this fax is a copy of the proposed settle (sic) agreement with Marsha Burress for $400,000.00; the $300,-000.00 shall be payable by check (not draft). It is understood that Marsha Burress agrees to the payment by way of monthly payments of the remaining settlement amount, with a starting date of September 9, 1991, payable starting four (4) years from September 9, 1991 in monthly payments for ten (10) years. Please provide me the monthly payment for insertion into the settlement agreement.

9. The proposed settlement agreement and release, which had been drafted by Phillip Turner, set forth the terms of the agreement as follows:

> PAYMENTS. In consideration of the Release set forth above, the insurer (United States Fidelity and Guaranty Company) on behalf of the defendant, hereby agrees to pay to the plaintiff the following sums in the following manner:
>
> A. CASH PAYMENT. The insurer will make a cash payment of $300,000.00 made payable to MARSHA BURRESS AND THEIR ATTORNEY, DAN E. TURNER
>
> B. $_____/month with the first payment starting four (4) years from the funding date and guaranteed for ten years thereafter.

10. Following receipt of these letters, Miller telephoned Phillip Turner and requested certain information for the purchase of the annuity. Miller sought the annuitant's full name, address, date of birth, social security number and beneficiaries. On September 12, 1991, Phillip Turner responded by letter to Miller's request for information. He provided the details sought by Miller.

11. On September 12, 1991, Miller used the information that Phillip Turner had previously provided to generate an annuity quote. The annuity quote provided, in pertinent part, as follows: "A PREMIUM OF $100000 WILL PURCHASE MONTHLY PAYMENTS OF $1482.18 FOR 10 YEARS BEGINNING 4 YEAR(S) FROM POLICY ISSUE. GUARANTEED PAYOUT = $177,861.60." Miller did not generate an annuity quote for a lifetime annuity because there had been no discussions of a lifetime annuity, and Miller did not have facilities at his office to generate such a quote. Miller also used the information provided by Phillip Turner to prepare an application for the purchase of an annuity from Fidelity and Guaranty Life Insurance Company (F & G Life). The application for the annuity prepared by Miller sought an annuity with monthly payments for ten years of $1482.18 beginning September 9, 1995. Miller also prepared the $300,000.00 check on September 12, 1991. On September 13, 1991, Miller issued a check for $100,000.00 for the purchase of the annuity and mailed it and the application to F & G Life. Miller sent a copy of the annuity quote, the annuity application and the proposed settlement agreement and release to Nordstrom.

12. The settlement agreement prepared by Phillip Turner was signed by Burress and Dan Turner prior to the end of September 1991. This document, however, was never signed by USF & G or Nordstrom. Although Nordstrom found that the terms of the payments were accurately stated, he was

not satisfied with the language of certain provisions and the omission of others.

13. The $300,000.00 check was subsequently received by the Turners and cashed on September 18, 1991. The check issued to F & G Life was cashed on September 20, 1991.

14. A letter, dated September 20, 1991, was mailed by F & G Life to Burress. The letter informed Burress that USF & G had purchased an annuity for her. The letter stated that payments of $1,482.18 per month would begin on September 9, 1995 and continue for "10 years only." Burress reviewed the monthly payment amount with Phillip Turner. Turner advised Burress that the figure seemed somewhat low.

15. Nordstrom began working on his own version of a settlement agreement and release on September 27, 1991, following the conclusion of the trial of the other Peppermint Twist cases. In preparing the settlement agreement, Nordstrom used a settlement agreement from a prior case, *Hinze v. Atchison, Topeka & Santa Fe,* as a guide. He used it because the settlement in that case also provided for an annuity. The annuity in *Hinze,* however, called for a lifetime annuity. The *Hinze* settlement document contained the following payment schedule for the annuity:

> Three Thousand One Hundred Dollars ($3,100.00) per month for 240 guaranteed payments and life thereafter, to Richard B. Hinze. The first payment shall be made on July 1, 1989.

Nordstrom mistakenly included the "and life thereafter" language in his Burress settlement agreement and release document. The annuity payment language read as follows:

> One Thousand, Four Hundred & Eighty Two Dollars and Eighteen Cents ($1,482.18) per month for 120 guaranteed payments and life thereafter to Marsha Burress. The first payment shall be made on September 9, 1995.

Nordstrom sent the final version of the settlement agreement and release to the Turners on October 1, 1991.

16. Phillip Turner faxed a letter to Nordstrom on October 2, 1991 containing certain objections to Nordstrom's proposed settlement agreement and release. The letter stated:

> 7. *DISCHARGE OF OBLIGATION* should read:
>
> > The obligation of the Defendant, the Insurer, to make each installment payment shall be discharged upon the cashing of a valid check in the amount of such payment by the designated party to whom the payment is required to be made under this settlement agreement.
>
> Also on Page 6, the Paragraph 8, entitled *Confidentiality,* should be taken out in its entirety, as it is not part of the agreement.
>
> In regard to the Journal Entry of Dismissal, Line 5 on Page 2 should be through "her" attorney, not "his". Additionally, the case caption should include *only* Marsha Burress, not the other plaintiffs.
>
> If you would make these corrections and return to our office the corrected originals today, we will be glad to have our client execute and sign the Settlement Agreement and hand deliver the documents back to your office for filing with the Court by this afternoon.

17. Nordstrom made most of the requested corrections and returned the document to the Turners on October 2, 1991 with the following letter:

> I have your FAX transmission of October 2, 1991, regarding changes to the Journal Entry of Dismissal and the Release. I have made all of the changes you require with the exception of the change to Paragraph 7 which will not be done. This is a release of the defendant and you will be able to look only to the provider of the annuity contract or contingently to USF & G. That is the intent and always has been. The defendant will be completely out of it and, of course, as you know, the defendant has no assets or wherewithall anyway. I trust this is satisfactory. Please have the documents executed and returned and we will place them of record appropriately. Consider the Burress matter concluded.

18. Miller closed the USF & G file on the Burress claim in early October and sent it to the home office for storage. He believed

that the settlement was final except for the need for a release signed by Burress.

19. On November 7, 1991, Dan Turner sent Nordstrom a signed copy of the settlement agreement and release that had earlier been prepared by Phillip Turner and rejected as unsatisfactory by Nordstrom. The amount of the monthly annuity payment remained blank on this document. Included with the settlement agreement and release was a journal entry dismissing Burress' lawsuit.

20. Nordstrom signed the journal entry and sent it to the state court for filing. The order of dismissal was filed by the state court on November 13, 1991.

21. Nordstrom noted Dan Turner's mistake of November 7, 1991 in a letter written on November 15, 1991. The letter read in part as follows:

The release that you have had your client execute was the release that I told you by letter of October 2, was unacceptable. I adopted some of the language from your changes, with exception of the change to paragraph 7, and forwarded a revision back to you. I forward once again that revision and must insist that your client execute this release that was the agreement of the parties.

Although the Journal Entry was not totally acceptable to me either (you will recall by my October 2 letter I also provided a Journal Entry which I thought was mutually satisfactory) I nevertheless have approved that Journal Entry and caused it to be filed, so at least we have a dismissal of this case. However, the terms and conditions under which the annuity will be paid are not set forth in the agreement currently signed by your client, but rather are in the enclosed document, which, unlike yours, sets out specifically the money involved and does constitute a release at this date and time of the Peppermint Twist. Please expedite this as the agreement has been in the executory stages far too long at this point.

The reference in the letter to the omission of the terms and conditions of the annuity in the document signed by Burress referred to the blank in the document concerning the amount of the monthly annuity payment.

22. The settlement agreement and release drafted by Nordstrom was ultimately signed by Burress, Nordstrom and Miller. It was dated as executed on December 5, 1991. This document set forth the terms of the settlement as follows:

In consideration of the full discharge of claims set forth above, the Insurer hereby agrees to pay the following sums in the following manner:

A. Three Hundred Thousand Dollars ($300,000.00), conditioned upon the proper execution of this agreement, to Marsha Burress and Dan Turner, her attorney.

B. One Thousand, Four Hundred & Eighty Two Dollars and Eighteen Cents ($1,482.18) per month for 120 guaranteed payments and life thereafter to Marsha Burress. The first payment shall be made on September 9, 1995.

23. Neither Burress, Nordstrom nor Miller were aware of the differences in the terms of the annuity when they signed the agreement. Burress did not discuss with her attorneys an annuity that called for payments for life at the time she signed the settlement agreement and release. Neither Burress nor her attorneys had ever discussed a lifetime annuity with either Miller or Nordstrom. Burress believed that her agreement to settle her lawsuit provided for a payment of $300,000.00 and a $100,000.00 annuity to be paid out for ten years beginning September 9, 1995. Dan Turner and Phillip Turner became aware of the discrepancy between the two settlement agreements in late November or early December 1991, after their client had signed the document but prior to the signings of Nordstrom and Miller. They chose, however, not to inform Nordstrom or Miller about the differences.

24. Miller was advised by F & G Life in January 1992 that the settlement agreement document contained an error. He called Nordstrom and advised him of this information. Nordstrom reviewed the document on January 21, 1992 and immediately discovered the additional language "and life thereafter." He called Miller and acknowledged that he

was totally at fault for the mistake. On January 21, 1992, Nordstrom wrote Dan Turner and informed him that the signed settlement agreement contained an error concerning the terms of the annuity. The letter stated:

It comes to the attention of the company that even after both of our efforts at the settlment [sic] agreement and release that there is still an error. Your version, copy of which is enclosed, correctly states the payment, whereas we inadvertently included some language from another release in ours. Enclosed please find the revised Page 3 which does correctly reflect the agreement to pay $1,482.18 per month for ten (10) years commencing December 9, 1995, said payments to be guaranteed.

It is obvious that that was the agreement, and this needs to be so changed to reflect so that the annuity may be purchased now. Enclosed please find a copy of the Release executed by all concerned, except for yourself, which I would appreciate your forwarding on to your client for her signature and returning it to us.

The letter incorrectly indicated that the annuity had not been purchased. The annuity had been purchased in September from F & G Life by Miller.

25. On January 27, 1992, a member of Nordstrom's law firm again wrote Dan Turner concerning the alleged error. This letter again asked Turner to obtain his client's signature on the revised documents.

26. Dan Turner responded with the following letter:

In response to your letter of January 27, 1992, the settlement agreement signed by our client was the proposal presented by your office, which your client accepted. We therefore expect USF & G to perform in accordance to the terms contained therein.

Additionally, Marsha Burress has stated that, if necessary, she will hire other counsel in order to enforce the terms of the agreement.

27. This lawsuit was filed on February 5, 1992.

## CONCLUSIONS OF LAW

1. Kansas law recognizes the right of a party to a written contract to have the document reformed to reflect the true agreement of the parties if the document does not accurately state the agreement due to mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party. *Andres v. Claasen,* 238 Kan. 732, 714 P.2d 963, 969 (1986). The doctrine of mutual mistake applies to written settlement agreements. *See Fieser v. Stinnett,* 212 Kan. 26, 509 P.2d 1156, 1159–60 (1973); *Rymph v. Derby Oil Co.,* 211 Kan. 414, 507 P.2d 308, 312 (1973). The party seeking reformation has the burden of proving by clear and convincing evidence that the contract does not set forth the true intent of the parties. *Jones v. Crowell,* 164 Kan. 261, 188 P.2d 908, 911 (1948).

2. The question of whether a binding contract was entered into depends upon the intention of the parties. *Arrowhead Construction Co. v. Essex Corp.,* 233 Kan. 241, 662 P.2d 1195, 1201 (1983). In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms. *Id.* "To constitute a meeting of the minds, there must be a fair understanding between the parties which normally accompanies mutual consent, and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Steele v. Harrison,* 220 Kan. 422, 552 P.2d 957, 962 (1976).

3. The fact that parties to an oral agreement contemplate the execution of a formal writing as evidence of their agreement does not necessarily imply that they have not already bound themselves to a definite and enforceable contract. *King v. Wenger,* 219 Kan. 668, 549 P.2d 986, 989 (1976). Whether parties to an informal agreement become bound prior to the drafting of a contemplated formal document is largely a question of intent on their part. *Id.* The intent of the parties is to be determined by the surrounding facts and circumstances of each case. *Id.*

■■■ 4. A contracting party is under a duty to learn the contents of a written contract before signing it. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, 736 P.2d 888, 891 (1987). Accordingly, a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand the terms. *Id.* 736 P.2d at 892. This rule, however, is inapplicable where there is a mutual mistake of fact. *Id.*

■■■ 5. After carefully considering the record and the aforementioned standards, the court finds that the following has been established by clear and convincing evidence: (1) Burress and PTMC, through USF & G, entered into a legally binding settlement during the month of September 1991; (2) the settlement called for Burress to receive $300,000.00 and $100,000.00 in an annuity; (3) the annuity was to be paid, pursuant to Burress' instructions, in monthly installments over a period of ten years beginning on September 9, 1995; (4) Burress and USF & G contemplated entering a document memorializing the agreement and releasing PTMC from further liability; and (5) the final settlement agreement, which was signed by all parties, contained a mutual mistake of fact in that it provided for a lifetime annuity for Burress.

6. The terms of the agreement were set forth in letters and documents supplied by Burress' counsel on September 9 and September 11, 1991. The only matter unknown to the parties at that time was the monthly amount of the annuity. They, however, understood that the monthly amount was to mathematically calculated by USF & G and inserted into a written document memorializing the existing oral agreement.

7. The contention by Burress that the letters and documents supplied by her counsel on September 9 and 11, 1991 were mere proposals and that the parties were negotiating the terms of the settlement up to the time that the final settlement agreement and release was signed in November and December 1991 is without any reliable basis or support. All of the evidence in the record, except for some testimony provided by Dan Turner and Phillip Turner which the court found lacking in credibility, shows that a settlement was reached in September 1991. No negotiations concerning the material terms of that agreement occurred after that time. The documents and correspondence show a situation where the only matters left for resolution concerned the precise language to be used in the settlement agreement and release. In addition, the documents and testimony demonstrate that, after all of the material terms were agreed upon, Nordstrom prepared a document which erroneously described the number of payments to be made under the annuity that had already been purchased. Burress, Nordstrom and Miller signed the final settlement agreement under the mistaken belief that it contained the terms of the annuity as originally agreed to by the parties.

8. This case presents a classic case of a mutual mistake of fact. Equity requires reformation of this settlement agreement. The court hereby directs the settlement agreement be reformed to reflect the parties' mutual intentions. The settlement agreement shall be reformed to show that Burress is entitled to 120 monthly payments of $1482.18 to begin on September 9, 1995.

**IT IS THEREFORE ORDERED** that judgment be entered for the plaintiff and against the defendant. The court hereby reforms the settlement agreement to conform to the agreement reached by the parties. Section 2(B) of the settlement agreement is hereby reformed to read as follows:

One Thousand, Four Hundred & Eighty Two Dollars and Eighteen Cents ($1,482.18) per month for 120 guaranteed payments to Marsha Burress.

The first payment shall be made on September 9, 1995.

**IT IS SO ORDERED.**