**CITY OF WICHITA, KANSAS, a Kansas Municipal Corporation, Plaintiff–Appellant,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, a Missouri Corporation, Defendant–Appellee.**

**No. 92–3453.**

United States Court of Appeals, Tenth Circuit.

May 25, 1994.

---

Lee H. Woodard (Gary E. Rebenstorf and Joe Allen Lang of the City of Wichita, Wichita, KS, with him on the briefs) of Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, KS, for plaintiff-appellant.

Robert L. Howard (Gary L. Ayers of Foulston & Siefkin, Wichita, KS, Lawrence A. Dimmitt and Michael C. Cavell of Southwestern Bell Telephone Co., Topeka, KS, with him on the brief) of Foulston & Siefkin, Wichita, KS, for defendant-appellee.

Before LOGAN and BRORBY, Circuit Judges, and SEAY,* District Judge.

BRORBY, Circuit Judge.

The City of Wichita, Kansas (City) appeals the summary judgment order denying its demand for additional franchise fees from Southwestern Bell Telephone Company (Bell). This diversity action requires construction, under Kansas contract law, of a compensation clause found in the City's franchise agreement with Bell. Title 28 U.S.C. § 1291 provides jurisdiction and we affirm.

## BACKGROUND

In late December 1983, the Wichita City Commission passed an ordinance authorizing Bell to operate a telephone system in Wichita. Compensation in return for the use of City streets and other rights-of-way was defined, in pertinent part:

> [Bell] shall pay the City, either five percent (5%) of the gross receipts of Southwestern Bell Telephone attributable to its Wichita operation, or $1.5 million in 1984, $1.6 million in 1985, $1.7 million in 1986, $1.8 million in 1987, $1.9 million in 1988, whichever is the greater amount in any given year.... True-up payments shall be made at the end of each year this ordinance is in effect when five percent (5%) of the above referenced annual service receipts exceeds the annual stated amount. The term gross receipts shall not include any income from services ... sold or provided by or in competition with other suppliers or service providers.

Wichita City, Kan., Ordinance No. 38–605 § 6 (Dec. 30, 1983). Essentially, this section calls for an accounting of five percent of Bell's gross receipts from noncompetitive services in Wichita and a comparison of that figure against a fixed annual amount. Bell is obligated to pay the greater amount.

Prior to the December 1983 enactment of the contract ordinance, however, the parties heartily disputed the definition of compensation. In early September 1983, Bell asserted it would only pay a fixed annual amount to the City. Bell opposed the City's attempts to base compensation on a percentage of

* The Honorable Frank H. Seay, Chief District Judge for the Eastern District of Oklahoma, sitting by designation.

gross receipts, in part because the parties had yet to agree on the categories of "competitive" and "noncompetitive" services.

In late September, Bell provided the City with a list of revenue categories giving Bell's reasons for classifying each category as competitive or noncompetitive. The nine categories included long distance caller service, long distance access charges, business exchange service, custom calling service, directory assistance, private line service, coin caller service, residential exchange service, and miscellaneous non-recurring charges. In particular, Bell sought to exclude long distance access charges from the City's gross receipt definition because of the anticipated competitive market and because of the uncertain nature of FCC regulation.[1]

Nonetheless, in late November 1983, the City Attorney submitted a proposed draft of the ordinance defining gross receipts to include six revenue categories: directory assistance, extra directory listings, residential exchange service, business exchange service, local coin caller service, *and access charges.* In early December, Bell's attorney responded "we continue to believe inclusion of 'access charges' in Section [6] is inappropriate.... Accordingly, we will not accept, nor make payments based on, an ordinance which applies to such charges." Memorandum & Order at 5, Findings of Fact ¶ 11. Bell made several proposals attempting to limit the inclusion of access charges, but eventually, proposed the ordinance not include a list of service categories.

After the ordinance passed, without reference to specific service categories, Bell continued to dispute the ordinance for reasons unrelated to this appeal. During negotiations to resolve these unrelated matters, the City Attorney and Bell's attorney returned to the uncertain definition of noncompetitive gross receipt revenue categories.

In late May 1984, Bell proposed a definition of the noncompetitive services phrase to include five revenue categories: local residence exchange, local business exchange, extra directory listings, local coin caller service, and local directory assistance. The definition would be used for calculating gross receipts in 1984 subject to annual review thereafter. The City Attorney agreed to this definition in writing but did not seek separate approval from the City Commission. Using those categories, Bell made payments throughout the 1984–88 term, including "true-up" payments based on five percent of the five revenue categories. No further negotiations took place. Bell's payments over the five year period totaled over $8.86 million.

In September 1988, the City retained an independent auditor to review Bell's payments during the term. The audit reported a deficiency of over $8.885 million based on the exclusion of three revenue categories from the definition of gross receipts for noncompetitive services: access revenues ($7.9 million); local private line charges ($344,000); and nonrecurring charges ($584,000). The City negotiated and approved a new franchise ordinance in April 1989, then filed a demand suit in June 1990.

Before the district court, the City took the position the three revenue categories were improperly excluded from gross receipts. Revenues from those categories were not from competitive services and therefore not excludable under the plain meaning of § 6. The district court found Kansas law allowed the court to look beyond the plain meaning of § 6 and examine the background and contemporaneous negotiations of the parties to determine their intent. Memorandum and Order at 15–16, Conclusions of Law ¶ 3. The court then adopted Bell's position that no meeting of the minds regarding gross receipts was reached when the ordinance was formally adopted and approved by the City Commission. Instead, the court ruled the

1. These negotiations occurred while Bell's January 1984 divestiture from AT & T was still pending. Long distance access charges were part of an FCC plan to replace revenues lost by Bell when it could no longer participate in interstate long distance service revenue. Charges would be assessed against competitive long distance carriers, such as MCI, Sprint, and AT & T, and

Wichita end users for the right to "access" Bell's local network to initiate and complete long distance calls. *See In the Matter of MTS and WATS Market Structure (Phase I),* 93 F.C.C.2d 241 (1983), *aff'd in relevant part, National Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985).

exchange of letters in late May 1984 constituted an accord and satisfaction. Their accord and satisfaction limited gross receipts to the noncompetitive services found in the original five revenue categories. *Id.* at 25–26, Conclusions of Law ¶ 21. Accordingly, the court rejected the City's attempt to include three additional revenue categories that were never intended to be included in the definition of gross receipts. On these grounds, the district court granted Bell's summary judgment motion. The City timely appeals.

## DISCUSSION

■ On appeal, the City first argues Bell is bound to the express terms of § 6, not the purported accord and satisfaction, because Bell's limited acceptance of the ordinance formed a contract based on the language of the ordinance. The City next argues the language of the compensation clause is unambiguous, therefore the district court improperly examined extrinsic evidence of the parties' prior negotiations and subsequent May 1984 agreement. Finally, the City contends its City Attorney lacked authority to enter any agreement resulting in the exclusion of the three categories.[2] We affirm on different grounds.

### I.

■ We are not bound to the district court's reading of state contract law on summary judgment; our review is de novo.

**2.** The City raises several other attacks on the district court's theory of an accord and satisfaction. Since we affirm the district court on other grounds, the challenges relating to accord and satisfaction will not be discussed.

In particular, the City argues its City Attorney lacked sufficient knowledge of Bell's business to enter into a binding accord and satisfaction. *See Matheney v. El Dorado*, 82 Kan. 720, 109 P. 166, 167 (1910). Since we do not rely on the district court's rationale, we did not address this argument. To the extent the City argues something more, we find no reference to a clear assertion of fraud or misrepresentation during the district court proceedings. Without fraud, mistake, or duress, competent parties are bound to a contract made in their own terms. *Flight Concepts Ltd. Partnership v. Boeing Co.*, 819 F.Supp. 1535, 1542 (D.Kan.1993) (citing *Augusta Medical Com-*

*Deepwater Invs. Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1106 (10th Cir.1991). Nor are we limited to the grounds relied upon by the trial court but may uphold summary judgment on conclusions of law supported by the record. *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). We first address whether the parties created an enforceable contract with the City's formal adoption and Bell's limited acceptance of the contract ordinance.

■ Under Kansas contract law,[3] an ordinance granting a right, accepted and actually fulfilled, becomes an irrevocable contract. *See City of Baxter Springs v. Baxter Springs Light & Power Co.*, 64 Kan. 591, 68 P. 63, 66 (1902); Eugene McQuillin, 10 *The Law of Municipal Corps.* § 29.03, at 254 (3d ed. 1990). A contract is formed by a mutual understanding of the parties on the same matter and terms of the contract. *Steele v. Harrison*, 220 Kan. 422, 552 P.2d 957, 962 (1976); E. Allan Farnsworth, *Contracts* § 3.1, at 112 (2d ed. 1990). Even absent a written agreement, one or more terms and conditions can be implied from the conduct of the parties. *See Atchison County Farmers Union Co-Op Ass'n v. Turnbull*, 241 Kan. 357, 736 P.2d 917, 922 (1987).

■ The Wichita Ordinance specifically requested, in § 13, written acceptance from Bell. Bell's written "limited acceptance" disputed several issues not relevant to this ap-

*plex, Inc. v. Blue Cross of Kansas, Inc.*, 227 Kan. 469, 608 P.2d 890, 895 (1980)).

**3.** Neither party challenges the district court's use of Kansas contract law. The ordinance specifically refers to itself as "a contract between the City of Wichita and Southwestern Bell Telephone subject to the provisions of the laws of the state of Kansas." Ordinance No. 38–605 § 13. Kansas law may allow parties to contractually determine the governing law for their disputes. *See Mark Twain Kan. City Bank v. Cates*, 248 Kan. 700, 810 P.2d 1154, 1157–59 (1991). Nonetheless, under principles of *lex loci contractus*, Kansas law would still apply. *See American States Ins. Co. v. McCann*, 17 Kan.App.2d 820, 845 P.2d 74, 77 (1993) (in Kansas, the choice of law to apply to construction of a contract depends on where the contract was made). The contract was made in Kansas.

peal. Significantly, Bell did agree to pay a percentage of gross receipts; a term of compensation sought by the City but earlier disputed by Bell. The plain language of § 6 calls for no more. During the length of the ordinance, Bell fulfilled its agreement by making "trued-up" payments to the City when the five percent margin of gross receipts exceeded the fixed annual amounts. We conclude Bell's written acceptance and fulfillment of the ordinance created an enforceable contract based on the language of the ordinance.

## II.

■ Although, through its acceptance of the contract ordinance, Bell is bound to the language of the ordinance, the fundamental dispute is whether Bell properly calculated five percent of gross receipts from noncompetitive services. Section 6 allows Bell to exclude from gross receipts "any income from services ... sold or provided by or in competition with other suppliers." We next seek what meaning the parties intended to give this phrase.

■ The City argues the district court erroneously relied on extrinsic evidence when the meaning of § 6 is plain on its face. In Kansas, extrinsic evidence is not admissible if the intent of the parties in the contract is clearly ascertainable from the "four corners" of the document. *Brown v. Lang*, 234 Kan. 610, 675 P.2d 842, 846 (1984). The initial determination of whether a contract provision is ambiguous is a question of law. *Simon v. National Farmers Org.*, 250 Kan. 676, 829 P.2d 884, 888 (1992); *see Missouri Pac. R.R. Co. v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 799 (10th Cir.1988) (applying Kansas law); *All West Pet Supply Co. v. Hill's Pet Prods. Div.*, 840 F.Supp. 1433, 1439 (D.Kan.1993) (same). The determination of the ambiguity of a contract is a question of

law reviewed de novo. *Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir.1992) (citing *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir.1988)).

The City's argument is undercut by its concession the § 6 exclusion was intended to provide the parties with a flexible standard for determining "services ... by or in competition" in a rapidly changing telecommunications industry. Precisely how the parties defined the scope of noncompetitive services did not come from the natural or dictionary usage of the term "competition" but rather from their changing understanding of the newly disintegrated telephone industry. The phrase was negotiated during the breakup of AT & T when competitive markets for Bell's services were uncertain. We find the phrase describing the competitive services exclusion to be ambiguous because the parties intended their subsequent interpretation of the phrase to control.

■ We thus turn to extrinsic evidence and to general rules of construction of an ambiguous contract. The facts and circumstances surrounding the execution of a contract may be considered to ascertain the intention of the parties. *Heyen v. Hartnett*, 235 Kan. 117, 679 P.2d 1152, 1157 (1984). Also the subsequent conduct of the parties— their practical construction of terms of the contract—should aid the court. "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight." *Id.; see First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 602 P.2d 1299, 1304 (1979); *Reese Exploration, Inc. v. Williams Natural Gas Co.*, 983 F.2d 1514, 1519 (10th Cir.1993) (citing *First Nat'l Bank*).

■ Reviewing the uncontroverted facts,[4] the parties' intent is clear. Bell did not want

4. In this case, we are aided by a list of uncontroverted facts incorporated into the court's memorandum and order. The list was originally posited by the district court and, during a hearing on the matter, agreed to by the parties.

Despite these precautions, the City would now have us remand the case because of disputed facts. The City contends the district court failed to acknowledge the dispute raised by evidence

from the City's experts that the three categories fell within § 6 as noncompetitive services. The City presented affidavits, from a telecommunications industry expert and from its independent auditor, stating all three revenue categories should be considered noncompetitive.

In our review of a summary judgment order, the existence of some disputed facts does not require reversal. *Anderson v. Liberty Lobby, Inc.*,

access charges included in the definition of "gross receipts" and would not have accepted the contract ordinance if it believed access charges were included. Representatives of both parties mutually interpreted § 6 to include five revenue categories and the contract was fully performed on that interpretation. The City accepted Bell's payments during the ordinance term without any indication of a contrary understanding of § 6 and did not exercise its right to renegotiate the inclusion of new revenue categories. Although we decline to follow the district court's rationale, we agree the City has failed to show the parties intended to include three other revenue categories—access charges, local private line charges, and nonrecurring charges—within the definition of § 6 "gross receipts."

## III.

 Finally, the City argues, even if the City Attorney agreed in May 1984 to the five revenue categories as the definition of noncompetitive gross receipts, the City Attorney lacked the authority to bind the City. One who makes a contract with a municipal corporation is presumed to know the limitations on its power to contract and also on the power of any of its agents to contract. *Weil & Assocs. v. Urban Renewal Agency*, 206 Kan. 405, 479 P.2d 875, 885 (1971) (citing 10 McQuillin, *supra*, § 29.04, at 256). Absent limitations, a city attorney may bind a municipality to the same extent that any attorney may bind a client. 10 McQuillin, *supra*, § 29.15, at 316. The City contends Kansas statutory law does not allow a contract ordinance to be enacted, amended, or nullified without the formalities of City Commission approval. *See* Kan.Stat.Ann. § 12–2001(b)(6) & (7); *City of Wichita v. Kansas Gas & Elec. Co.*, 204 Kan. 546, 464 P.2d 196, 203 (1970) (interpreting Kan.Stat.Ann. § 12–2001). Therefore, the City contends, the City Attorney's May 1984 agreement, which either

formed a new contract or amended the prior ordinance, could not bind the City. We disagree.

As the district court noted, the actions of the City Attorney were directed toward interpreting the competitive services exclusion, not amending it. Memorandum and Order at 25, Conclusions of Law ¶ 20. Therefore, the formal prerequisites of Kan.Stat.Ann. § 12–2001 do not apply. City attorneys, as appointed officials with their duties defined in Kan.Stat.Ann. § 13–2105, are required to draft all ordinances, contracts, and agreements. Kansas statutes, however, do not limit a city attorney's ability to bind its client to a practical interpretation of terms of a contract.

 Under general agency principles, an attorney has the authority to interpret a contract on behalf of the client. An attorney is clothed with sufficient apparent authority to bind a client for services that are routinely and directly connected with the representation. *See Bucher & Willis Consulting Eng'rs, Planners & Architects v. Smith*, 7 Kan.App.2d 467, 643 P.2d 1156, 1159 (1982). Here, the City Attorney's agreement to use five revenue categories as the definition of § 6 gross receipts was not outside the scope of his authority.

### CONCLUSION

Section 6 of Wichita City Ordinance No. 38-605 required Bell to pay, during 1984–88 term, five percent of gross receipts from its Wichita services provided not in competition with other suppliers. Subsequent to enactment of the ordinance, the City Attorney agreed with Bell to interpret noncompetitive services to include only five revenue categories in 1984. His interpretation allowed for annual renegotiation thereafter. The parties did not renegotiate and Bell fully performed. We conclude the parties did not intend, during the term, to include the three additional

477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The City's evidence does not relate to a material issue. In determining the meaning the parties intended to give § 6, the true meaning of the terms is not as important as the expectations of the parties. Farnsworth, *supra*, § 7.7, at 497. Here, Bell has established the

parties intended to include five revenue categories within the meaning of noncompetitive gross receipts. None of the City's evidence either undermines the parties' May 1984 agreement or suggests the parties later intended to include other categories.

revenue categories the City now proposes. Accordingly, we **AFFIRM** the district court's order of summary judgment.