NOT DESIGNATED FOR PUBLICATION

No. 121,851

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHRISTOPHER J. RINGEL,
*Appellant*,

v.

NUEHEALTH, LLC,
*Appellee.*

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed February 5, 2021. Affirmed.

*James B. Biggs*, of Cavanaugh, Biggs & Lemon, P.A., of Topeka, for appellant.

*Tara S. Eberline*, of Foulston Siefkin LLP, of Overland Park, and *Jay F. Fowler*, of the same firm, of Wichita, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

PER CURIAM:  After NueHealth terminated his employment, Christopher Ringel sued for breach of contract and promissory estoppel. Ringel claimed that NueHealth breached his 2017 employment agreement. But the district court granted summary judgment in favor of NueHealth, finding that Ringel failed to show the parties entered into a 2017 employment agreement and failed to establish the elements of promissory estoppel. Ringel appeals, arguing that the district court erred in granting summary judgment and abused its discretion in admitting a post-hearing affidavit. Finding no error, we affirm.

1

*Factual and Procedural Background*

NueHealth is a subsidiary of Nueterra Capital, LLC (Nueterra). In May 2016, Nueterra offered Ringel the position of Regional Vice President. In June 2016, Ringel and Tim O'Brien, then Nueterra's COO, signed a contract employing Ringel as a Regional Vice President to oversee the operations of NueHealth's health care facilities. Ringel signed that contract but never asked for nor received a copy of it before January 2018.

That 2016 employment agreement stated, in part, that Nueterra could change Ringel's title and duties from time to time, that Nueterra could assign Ringel's employment contract to other Nueterra entities, and that Ringel would work as an at-will employee. The employment-at-will doctrine generally holds that employees and employers may terminate an employment relationship at any time and for any reason unless there is an implied contract governing the employment's duration. *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, 554, 304 P.3d 1226 (2013).

Between April and August 2017, Scott Palecki (NueHealth's counsel) and several senior members of NueHealth's leadership team, including Ringel, negotiated potential new employment agreements. Because one issue on appeal is whether the parties agreed to a 2017 employment contract, we detail the evidence of the negotiations below.

Sometime between April and August 2017, Ringel began using the title of Regional President. Ringel alleged that NueHealth gave him this new job title and role as part of offering him the 2017 employment agreement. His job responsibilities moved from operational to developmental. John Palumbo (NueHealth's Vice Chairman) confirmed that Ringel started using the "Regional President" title as his duties moved to business development.

2

On August 4, 2017, Alex Knudson (one of Palecki's paralegals) emailed Ringel the latest version of a proposed employment agreement, unsigned. Because the effective date of this document was "April ___, 2017," we refer to this as the April employment offer.

On August 26, 2017, Palecki sent Ringel an email attaching a revised employment proposal:

> "Chris: I told Steve [Harmon] I would get your revised agreement to you yesterday and I apologize that due to circumstances outside of my control, I was unable to do so. I have made the changes discussed with Steve and the revised agreement is attached. I increased the base salary to $220,000 and I conformed the terms of the agreement to what we agreed to do with Bob [Yonke]'s agreement. No changes were made to the transaction bonus award, your job duties, or anything else outside of the above.

> "I'm sending so that you will have the benefit of the weekend to review this. I'm going to get Dan [Tasset]'s signature on this as soon as possible - hopefully Monday morning or perhaps Sunday afternoon. If possible I'd like to have your signature back by tomorrow. If not, please get to me as soon as you can."

This offer was unsigned. Because the effective date of this document is "August 25, 2017," we refer to this as the August employment offer. NueHealth sent Ringel the unsigned August employment offer before NueHealth received any 2017 offer Ringel had signed.

Although the April and the August employment offers differed in various ways, both documents included an initial term of 36 months during which NueHealth could fire Ringel only for cause and Ringel could resign only for good reason.

3

On August 28, 2017, Ringel emailed Harmon asking whether the bonus program structure would be part of the formal agreement. After Harmon sent him the commission plan, Ringel asked how the plan would relate to his facility administrators.

On an unknown date in or after August 2017, Dan Tasset (NueHealth's Chairman) signed the August employment offer on behalf of NueHealth. He gave that signed copy to Palecki but told him not to release it until he assessed Ringel's performance and authorized its release. Ringel did not see that signed copy until shortly before his deposition in January 2019.

On October 12, 2017, Ringel, unaware that NueHealth had the signed August employment offer, emailed Palecki his signed signature pages from the April employment offer. Ringel explained:

"Attached are my signature pages to the employment contract sent to me Aug 3-4. The attachment includes page 2 of the document with my original salary of $215,000. $220,000 was proposed at the end of August. I'm not comfortable adjusting my salary at this juncture and am satisfied with the $215,000 that was in the original document.

"Please forward me an executed copy of the agreement for my records."

Despite his request, Ringel never received an executed copy of the April employment offer. And neither party admitted at trial a copy of either the April or the August employment offers signed by both parties. In fact, no testimony was admitted that both parties had ever signed the same agreement.

Thereafter, Ringel tried to determine the status of his employment contract. On November 1, 2017, Ringel emailed Palumbo:

4

"Per [Yonke]'s request I'm forwarding my 10/12/17 correspondence to [Scott] P. regarding my signed employment agreement. I also sent another email to Scott on Oct 23 to please acknowledge that he received the original email with my signed employment agreement. He replied that day (10/23/17) that this would be processed ASAP. I also spoke with Scott about this last week at a Cook Partners Meeting here in TX and he assured me he would take care of it. Thanks for your interest and please call with questions."

That email to Palumbo was apparently ineffective, as on December 18, 2017, Ringel emailed Palecki, asking, "Do you know the status of my employment agreement signatures[?] Really isn't a big deal just need to know the official stance as to which agreement I'm following!"

On December 22, 2017, having received no response from Palecki, Ringel emailed Jeremy Tasset (NueHealth's CEO):

"Since Steve H (my direct report to) is no longer with the company so I'm coming to you with the below request.

"Can you please look into my employment agreement situation. I have not had my signed/executed employment agreement (that was presented to the management group) returned to me. I did forward my signed copy to Scott P some time ago and was told it was in a signature pile waiting for execution. I need to know which employment agreement NueHealth feels it is honoring as we move forward. In advance thanks for the clarification and please feel free to call me with questions."

Jeremy responded on December 27, 2017, "Chris, I do not follow. Do you have one signed employment agreement and another one (more recent) unsigned?" On January 1, 2018, Ringel answered:

"Original agreement signed when I came on board in June of 16. My modified employment agreement that included the potential for 2% equity (like the rest of the key

5

managers) was signed and returned to Scott P months ago. I did not return immediately as I was seeking bonus questions from HR that were never answered adequately. I have followed up with multiple emails to Scott asking where we're at in this process and getting a signed copy in my hands! Was told by Scott that it was in a stack to be signed?"

But on January 2, 2018, Ringel's termination was discussed in texts between Lori Carr (Senior Vice President for Human Resources) and Dan Tasset. Carr stated:

"Just finished all 3 conversations [with Yonke, Kevin Bentley, and Ringel]. All were [b]rief and professional. They believe this is a transition period and voiced hope that they'd work out a deal with Jeremy. I did let them know that if they didn't, they would be off Payroll on 1/31. Told all of them to transition today and no longer need to work."

On January 3, 2018, Ringel emailed Carr asking for a copy of the employment agreement she felt was in effect. Carr sent Ringel his June 2016 Regional Vice President employment agreement, stating it was his "fully executed employment agreement."

NueHealth terminated Ringel's employment effective January 31, 2018. Ringel then sued NueHealth, raising three claims:

1. Breach of his contract because it had an initial term of 36 months, during which NueHealth could not terminate him except for cause;
2. declaratory judgment that he had a right to receive the full benefits of a transaction bonus award; and
3. promissory estoppel.

NueHealth later moved for summary judgment, arguing that it had not entered into the employment agreement on which Ringel based his claim, and that Ringel could not prove the elements of promissory estoppel.

6

After argument, the district court granted summary judgment in favor of NueHealth, finding no genuine issue of material fact as to whether the parties entered a new employment agreement in 2017. Because the parties had no meeting of the minds, they had not entered a new contract:

> "Applying Kansas law to the undisputed facts at issue here, it is clear to this Court, as a matter of law, that Ringel and NueHealth never entered a binding employment agreement in 2017. The unsigned draft version of the employment agreement sent to Ringel on August 26, 2017 was an offer. When Ringel sent signed signature pages to NueHealth on October 12, 2017, of an April 2017 draft of the employment agreement with at least sixteen materially different terms that acted as a counteroffer and rejection of NueHealth's August 26, 2017 offer. Not only were some of the changes made by Ringel material, a few of them are major deal breakers for most employers in general. Specifically, those changes to paragraphs dealing with the Confidentiality and Intellectual Property aspect of the contract and attempting to remove the employment at-will provisions of the agreement. NueHealth never signed or otherwise agreed to the terms of Ringel's counteroffer. As a result, there was no meeting of the minds, and the parties never entered a binding employment agreement in 2017. The only agreement entered between the parties was thus the 2016 agreement, which was at-will, and Ringel is not alleging that NueHealth breached that contract."

The district court found declaratory judgment inappropriate because it is derivative of the breach of contract claim. And the district court found that Ringel failed to establish any of the elements of promissory estoppel. Ringel timely appeals.

I.    *Did the District Court Err in Granting Summary Judgment on Ringel's Breach of Contract Claim?*

We first address Ringel's argument that the district court erred in granting summary judgment on his breach of contract claim by finding the parties did not enter into a binding agreement in 2017. Ringel contends the two parties agreed upon the

material terms of Ringel's new employment contract, that there was a meeting of the minds, and that any differences between the April and August employment agreements are immaterial. He asserts that Palecki's August 26, 2017 email and Dan's signing of the August employment agreement show NueHealth's intent to bind themselves to the 2017 employment agreement.

In the alternative, Ringel argues that genuine disputes over material facts preclude summary judgment: the intent of the parties, whether the contracts circulated between the parties were final offers or drafts, and whether a contract existed.

*Standard of Review*

Our standard for reviewing summary judgment is well-established:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

Whether a contract exists is a question of fact because it turns on the parties' intentions. But when, as here, neither party disputes the legally relevant facts, the existence and terms of a contract raise a question of law subject to de novo review. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012).

8

*Analysis*

Typically, a plaintiff alleging a breach of contract must prove:

(1) The existence of the contract alleged in the petition;

(2) sufficient consideration to support the contract;

(3) the plaintiff's performance or willingness to perform in compliance with the contract alleged;

(4) the defendant's breach of the contract; and

(5) damages to the plaintiff caused by the breach.

*Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

A defendant is entitled to summary judgment if he or she can establish the absence of evidence necessary to support any of these elements. See *Peters v. Deseret Cattle Feeders*, 309 Kan. 462, 473, 437 P.3d 976 (2019). The issue here concerns only the first element—whether the district court correctly found that Ringel failed to show the existence of the contract alleged in his petition.

A plaintiff bringing a breach of contract claim bears the burden of proving the contract's existence by showing a proper offer, acceptance, and consideration. An offer and an acceptance are established when there is a "meeting of the minds on all the essential elements" and "[a]n unconditional and positive acceptance" that is outwardly communicated. *U.S.D. No. 446*, 295 Kan. at 282; *Southwest & Assocs., Inc. v. Steven Enterprises, LLC*, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (2004). The evidence must show with reasonable certainty that the minds of the parties met upon the same matter and agreed upon the terms of the contract. *Steele v. Harrison*, 220 Kan. 422, 428, 552 P.2d 957 (1976).

In contrast, a material change to an offer is not an acceptance but a counteroffer:

> "'[A] communicated offer creates a power to accept the offer that is made, and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract. Unless the original offeror subsequently expresses unconditional assent to the counter-offer there will never be a contract.'" *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007) (quoting *Steele*, 220 Kan. at 428).

And the outward communication must be made in a way that reasonably and normally accompanies mutual consent. See *Steele*, 220 Kan. at 428; *Southwest & Assocs., Inc.*, 32 Kan. App. 2d at 781. This test "is objective, rather than subjective, meaning that the relevant inquiry is the 'manifestation of a party's intention, rather than the actual or real intention.'" 32 Kan. App. 2d at 781.

The court may consider the facts surrounding preliminary negotiations to determine whether the parties outwardly expressed acceptance on the essential elements. Our Supreme Court in *U.S.D. No. 446*, cited Professors Arthur L. Corbin and Joseph Perillo's discussion on "the distinguishing characteristics of preliminary negotiations and binding agreements in terms of the parties' intentions and their manifest expressions of agreement":

> "'The term 'preliminary negotiation' . . . may be used to include all those communications and other events in a bargaining transaction that are antecedent to acceptance, that is, antecedent to the completion of the contract. In this sense, every offer is a part of the negotiation that is preliminary to the making of a contract. Indeed, there may be more than one offer. In the preliminary haggling process, there are frequently offers and counteroffers, each one of which has a certain legal operation, but, none of which is transformed into a contract. To determine whether or not a bargaining transaction actually results in the making of a contract, courts must consider all of the preliminary negotiations, all of the offers and counteroffers, interpret the various

10

expressions of the parties, and form a judgment as to whether they ever finally expressed themselves as in agreement on complete and definite terms.

. . . .

"'In the process of negotiation a party may use words that standing alone would normally be understood to be words of "contract," at the same time limiting them in such a way as to show that a subsequent expression of assent on his or her part is required. In such a case the expression is neither an operative offer nor an operative acceptance. It is merely part of preliminary negotiation.' 1 Corbin on Contracts § 2.1, pp. 100-01 (rev. ed. 1993)." 295 Kan. at 283.

In dealing with cases involving preliminary negotiations, such as this one, the crux is whether, at any particular time, the parties formed a contract. Parties can bind themselves to a contract orally or by informal letters or emails before they sign a document. "'The fact that the parties contemplate the subsequent execution of a formal instrument as evidence of their agreement does not necessarily imply they have not already bound themselves to a definite and enforceable contract.'" *O'Neill v. Herrington*, 49 Kan. App. 2d 896, 905, 317 P.3d 139 (2014). But "[w]here parties condition a contract on it being reduced to writing and signed, there is no enforceable contract until such act is accomplished." 49 Kan. App. 2d at 906. Thus, the finder of fact must determine whether a contract existed case-by-case. The district court did so here.

A.      *No genuine dispute of material facts exists.*

We first address Ringel's claim that a genuine dispute of material facts remains. He claims the parties disputed the intent of the parties and whether they formed a binding contract—questions of fact. Ringel contrasts Dan's direction not to release the signed employment agreement, which shows that NueHealth did not wish to contract, with Palecki's August 26, 2017 email to Ringel, which demonstrates a meeting of the minds. Ringel interprets this email as stating, "[I]f Plaintiff signed the Employment Agreement, Palecki would have Chairman [Dan] Tasset sign the agreement within the next two days."

11

But the contracts themselves contemplate they would be signed:

> "This Agreement may be executed in several counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument. Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile or electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the Parties signing and delivering in such manner."

Still, the parties show no evidence that they conditioned any 2017 contract on its being signed, and the "counterpart" section does not necessarily imply that the parties had not already bound themselves to a definite and enforceable contract. See *O'Neill*, 49 Kan. App. 2d at 905.

But even if we assume that Palecki's email was NueHealth's outward expression of its intent to be bound to an employment agreement, we find no genuine issue of material fact. Ringel never accepted the August employment offer in Palecki's August 26, 2017 email, and NueHealth never accepted Ringel's counteroffer in his October 12, 2017 email. The parties never assented to the same employment agreement.

An issue of fact is not *genuine* unless it has legal controlling force as to the controlling issue. "A disputed question of fact which is immaterial to the issue does not preclude summary judgment. Stated another way, if the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 934, 296 P.3d 1106 (2013).

B.     *The April employment offer and the August employment offer are materially different.*

Ringel's argument equivocates between the April employment offer and the August employment offer, generally referring to "the new Employment Agreement" without distinguishing between what Palecki sent on August 26, 2017, and what Ringel sent on October 12, 2017. Ringel thus asserts that the parties both agreed to a contract by that exchange, viewed in light of the surrounding circumstances.

Ringel asserts that the April employment offer and the August employment offer were not materially different, so even though he signed the April offer and Dan Tasset signed the August offer, the two documents were substantially the same. "A material term is a 'contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" *James Colborn Revocable Trust v. Hummon Corp.*, 55 Kan. App. 2d 120, 127, 408 P.3d 987 (2017) (quoting Black's Law Dictionary 1698-99 [10th ed. 2014]).

We detail a few of the many differences in the April and the August documents below, adding emphasis to highlight the changes:

- Opening paragraph:  Different effective dates.
    - April Employment Agreement (April):  "*April ___, 2017.*"
    - August Employment Agreement (August):  "*August 25, 2017.*"

- Paragraph 3(a):  Base salary.
    - April:  "*Two Hundred Fifteen Thousand Dollars ($215,000)*"
    - August:  "*Two Hundred Twenty Thousand Dollars ($220,000)*"

13

- Paragraph 3(b): The authority to determine a discretionary bonus and the criteria for determining such bonus.
  - April: "<u>Bonus</u>. Employee will be eligible for an annual discretionary bonus. This bonus amount, if deemed earned by *Employer in its sole discretion, will be determined by Employer based upon achievement of quarterly goals and objectives consistent with Employer's bonus plan policies and procedures, payable in quarterly increments on dates established by Employer.*"
  - August: "<u>Bonus</u>. *Executive* will be eligible for an annual discretionary bonus. This bonus amount, if deemed earned by *The Executive Committee of the NueHealth Board of Directors in their sole discretion.*"

- Paragraph 7(a): Changes in definition of "confidential information."
  - April:
    "For purposes of this Agreement, the term 'Confidential Information' means all of the Company's proprietary health care management systems, protocols and procedures, existing or possible computer systems, Company software in source or object code, other software in source or object code, *any information* about software development, forms and documentation, *ideas*, formulas, processes, devices, patterns, plans, product design, financial information, spreadsheets, statements, tax returns, financial projections, any Human Resources information including payroll details, existing *or possible* market and business strategies, customer lists, supply sources, *compilations*, programs, *methods*, business *opportunities* plans, models, formulas, *techniques*, sales data, physician relationships, vendor relationships, acquisition candidates, development candidates, employee candidates, demographic information and analysis, financial information, financing sources, project timelines, and checklists, Intellectual Property (as defined below), and other knowledge, together with all other information as to the business and other affairs of the Company, know-how, and trade

secrets not generally and lawfully known to the public, as the same may exist from time to time."

- o The August offer removed the "any information" above italicized language and replaced it with "written information," as well as removed other language:

"For purposes of this Agreement, the term 'Confidential Information' means all of the Company's then current proprietary health care management systems, protocols and procedures, existing computer systems, Company software in source or object code, other software in source or object code, *written information* about software development, forms and documentation . . . ."

- Paragraph 7(b): Changes in per diem consulting rate for post-termination consulting.

  - o The August offer added language: "During the Restriction Period, Executive agrees to make himself reasonably available to the Company for consulting at a per diem rate that reflects Executive's annual salary, *plus twenty-two percent (22%)*, as in effect immediately prior to Executive's termination of employment (plus reimbursement of Executive's reasonable expenses)."

- Exhibit C, Confidentiality and Intellectual Property Assignment Agreement, paragraphs 10, 11, 12, and 13:

  - o April:

    "*10. Not an Employment Agreement. Employee agrees that this Agreement does not constitute a contract of employment and, except to the extent expressly provided in another written agreement between the parties (if any), this Agreement in no way modifies or waives the employment-at-will status of Employee.*

    "11. Outside Work for Hire. Employee's employment or work for hire by third parties outside of the employment relationship with

Employer is discouraged by Employer. *Use of Employer's property, including without limitation Employer computers, software, or hardware, for such outside work, or any outside work done while Employee being paid to work for Employer, shall subject Employee to immediate termination.*

"12. <u>Access to Company Systems and Data</u>. Employee shall only access the Company's computer systems and networks, and the data residing on the same ('Company Data'), whether being transacted or stored on its computer systems or networks, or on any other storage platform, by means and/or methods approved in writing by the Company. *Use of unauthorized means and/or methods to access the Company's computer systems and networks, and the data residing on the same, shall be grounds for immediate termination and/or criminal and civil prosecution to the fullest extent permissible by law.*

"*13. <u>Assignment.</u> The parties hereto acknowledge that Employee's obligations hereunder are unique and personal; therefore, except as provided by law, Employee may not assign any of his rights and obligation under this Agreement. However, the Company may freely assign its rights and obligations under this Agreement, at the Company's sole and absolute discretion, without notice to Employee.*

"*14*. <u>General</u>. . . ."

"*15*. <u>Reports to Government Entities</u>. . . ."

o August:

"10. <u>Outside Work for Hire</u>. *Executive's* employment or work for hire by third parties outside of the employment relationship with Employer is discouraged by Employer.

"11. <u>Access to Company Systems and Data</u>. *Executive* shall only access the Company's computer systems and networks, and the data residing on the same ('Company Data'), whether being transacted or stored on its computer systems or networks, or on any other storage platform, by means and/or methods approved in writing by the Company.

"*12*. <u>General</u>. . . ."

"*13*. <u>Reports to Government Entities</u>. . . ."

16

These examples show that the April and August employment offers differed in their material terms, including the amounts of base salary, the effective dates and their resulting effect on the duration of the initial three-year term, the Confidentiality and Intellectual Property terms, the determination of discretionary bonuses, and the rates for post-termination consulting. As the district court noted, even a few changes would be "major deal breakers for most employers." We thus disagree with Ringel's contention that the differences between the April and the August employment offers were so immaterial that we should consider those two documents to be the same.

The relevant facts are undisputed. Those facts, viewed in light most favorable to Ringel, show that Ringel and NueHealth never entered into a binding employment agreement. As our Supreme Court has stated, to form a binding contract, one must accept the exact terms of an offer:

> "Although a contract may exist even though the parties agree to resolve nonessential terms at a later time, and minor differences between an offer and an acceptance may not prevent the formation of a contract, there must be an acceptance of the exact terms of an offer, and the acceptance must be unconditional and unequivocal." *U.S.D. No. 446*, 295 Kan. at 283-84.

See *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 516, 390 P.3d 56 (2017) (affirming the district court's holding that the parties never formed an express contract when they never expressed acceptance to a single version of the contract).

Between April and August 2017, there were offers and counteroffers, but none of them transformed into a contract, including the April employment offer that Knudson sent Ringel on August 4, 2017. See *U.S.D. No. 446*, 295 Kan. at 283. Palecki's August email indicates that the April employment offer sent via Knudson's email had been revised and that Ringel and NueHealth understood that NueHealth no longer offered the

17

April employment offer. Instead, the August employment offer attached to Palecki's August 26, 2017 email was a new offer. Thus Ringel's signed signature pages of the April employment offer constituted a counteroffer and a rejection of the August employment offer. See *Nungesser*, 283 Kan. at 566. Because NueHealth never signed or otherwise outwardly agreed to the terms of Ringel's counteroffer, there was no meeting of the minds on all essential terms. See *U.S.D. No. 446*, 295 Kan. at 282.

Ringel thus failed to prove a binding contract on which he could rest his claim for damages from termination without cause. The only agreement in effect between the parties was Ringel's 2016 employment agreement, which stated that Ringel was an at-will employee and that NueHealth could change his title and duties. The district court did not err in granting NueHealth summary judgment on Ringel's breach of contract claim.

II.    *Ringel Fails to Preserve Some Claims.*

As an alternative to his express employment agreement claim, Ringel asks us to find that an implied-in-fact employment agreement existed. But the record shows that Ringel failed to raise this issue in the district court.

Under Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34), an appellant must point to the specific location in the record where he or she raised the issue being appealed and where the court ruled on that issue. If an issue was not raised in the trial court, it cannot be raised on appeal. See *Ruhland v. Elliot*, 302 Kan. 405, 417, 353 P.3d 1124 (2015). The rationale behind error preservation is simple:  a trial court cannot wrongly decide an issue never before it. See *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003).

Although exceptions to this rule exist, the party asserting the claim for the first time on appeal must invoke an exception and explain why the issue is properly before the

18

court. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); Kansas Supreme Court Rule 6.02(a)(5).

Ringel fails to do so. He did not raise this issue to the district court. Yet the determination of whether an implied contract creates an employment relationship requires a factual inquiry. *Peters*, 309 Kan. at 470. "[A]ppellate courts do not make factual findings in the first instance; we only review district court findings." *State v. Estrada-Vital*, 302 Kan. 549, 557, 356 P.3d 1058 (2015). Nor does Ringel argue any exception to the preservation rule on appeal. Thus, we decline to reach the merits of this unpreserved claim of an implied-in-fact employment agreement.

Ringel also argues that NueHealth's silent acquiescence to the contract establishes the need for an equitable remedy. He claims that NueHealth had a duty to share the status of his new employment agreement with him yet it failed to do so, allowing him to operate under that new employment agreement. But Ringel failed to raise a claim for equitable estoppel by silence in the district court, and he does not cite a *Godfrey* exception on appeal. Thus, we do not reach the merits of this unpreserved argument.

III. *Did the District Court Err by Granting Summary Judgment on Ringel's Promissory Estoppel Claim?*

Ringel next argues that the district court erred in not finding that promissory estoppel barred NueHealth from denying the existence of a contract. We address this claim, which Ringel raised to the district court.

*Analysis*

"Equitable estoppel is the effect of the voluntary conduct of a party whereby it is precluded, both at law and in equity, from asserting rights against another person relying

19

on such conduct." *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). Promissory estoppel is a sub-category of equitable estoppel. See 250 Kan. at 129 ("A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party [when it had a duty to speak] induced the first party to believe certain facts existed."). Promissory estoppel promotes a measure of basic fairness when a party makes a representation or promise in a way that reasonably induces another party to undertake an obligation or incur a detriment as a result. *Peters*, 309 Kan. at 473-74.

Parties typically raise promissory estoppel when they can show the existence of a contract but cannot show sufficient consideration to support the contract. See *Bouton v. Byers*, 50 Kan. App. 2d 34, 42, 321 P.3d 780 (2014) ("Kansas courts have explained that a party's *reasonable* reliance on a promise prompting a *reasonable* change in position effectively replaces the bargained for consideration of a formal contract, thereby creating what amounts to a contractual relationship."); Restatement (Second) of Contracts § 90 (1981). Yet the existence of a contract, and not consideration, is the issue here.

To succeed on a promissory estoppel claim, a plaintiff must show three elements:

(1) The promisor reasonably expected the promisee to act in reliance on the promise;

(2) the promisee acted as could reasonably be expected in relying on the promise; and

(3) the court's refusal to enforce the promise would sanction fraud or result in other injustice.

*Mohr v. State Bank of Stanley*, 244 Kan. 555, 574, 770 P.2d 466 (1989).

A defendant is entitled to summary judgment if he or she can establish the absence of evidence necessary to support any of these elements. See *Peters*, 309 Kan. at 473.

20

Ringel asserts that he meets these three elements, focusing on Palecki's representation that "the new Employment Agreement would be executed within a few days after [Ringel] signed the agreement." As to the first element, he asserts that after this email NueHealth reasonably expected Ringel to believe that his 2017 employment contract was in place and saw his reliance every day, still NueHealth never told him that the contract was not signed. As to the second element, he asserts that his additional inquiries whether NueHealth had signed the 2017 employment agreement and his performing the duties of Regional President show his reasonable reliance on the 2017 agreement. This reliance was detrimental because he was not compensated to the extent he should have been, and he did not have the legal protections from termination that he thought he had. And as to the third element, allowing NueHealth to benefit from his work without properly compensating him and to terminate him without legal cause created substantial injustice.

But Ringel fails to adequately define with sufficient particularity the promise he allegedly relied on. See *Bouton*, 50 Kan. App. 2d at 42. In Kansas, to enforce a promise under promissory estoppel, the parties must reach an agreement on all the essential elements of a complete contract. And a promise to continue to negotiate an agreement will not support a claim of promissory estoppel. *Owasso Dev. Co. v. Associated Wholesale Grocers, Inc.*, 19 Kan. App. 2d 549, 551, 873 P.2d 212 (1994) (applying Supreme Court's holding in *Bank of Alton v. Tanaka*, 247 Kan. 443, 453, 799 P.2d 1029 [1990], about partial performance to promissory estoppel).

Ringel argues that Palecki represented that "the new Employment Agreement would be executed within a few days after [Ringel] signed the agreement." Palecki's email stated:

"I'm sending so that you will have the benefit of the weekend to review this. I'm going to get Dan's signature on this as soon as possible - hopefully Monday morning or

21

perhaps Sunday afternoon. If possible I'd like to have your signature back by tomorrow. If not, please get to me as soon as you can.

"If you have any questions, please feel free to call me on my cell phone over the weekend."

Ringel's later emails show, however, that he did not know if NueHealth had promised to hold itself to the initial term. That is, Ringel did not know if NueHealth ever made a promise (1) on which NueHealth would have reasonably expected Ringel to rely or (2) for Ringel to reasonably act on. See *Mohr*, 244 Kan. at 574. But even if we assume that Palecki's email was a promise for NueHealth to hold itself to every term in the August employment offer, we find no evidence that Ringel ever accepted the terms of that offer. See *Owasso*, 19 Kan. App. 2d at 551.

Nor does the evidence show that Ringel acted to his detriment on Palecki's August "promise." The alleged detrimental harm Ringel claims did not occur until January 2018. But on October 12, 2017, Ringel sent a counteroffer to which NueHealth never agreed.

Further, Ringel's use of the title "Regional President" does not show that he did so in reliance on a new employment agreement. Neither Ringel's use of that title nor his change of duties were outside the scope of his 2016 employment agreement, which expressly permitted NueHealth to change his title and duties from time to time:

"Duties. Employer shall employ Employee in the capacity of Regional Vice President ('RVP') and will be assigned to oversee the operations of NHC managed and/or partially owned surgery centers, hospitals, and other health care facilities (collectively, 'Facilities' or singularly referred to as either 'any Facility' or 'a Facility') as determined from time to time by Employer. Employee will be responsible to manage the assigned Facility Administrator at Facilities. Employee's authority as RVP will be as determined by Employer and NHC. *Employee's title and duties may be changed by Employer or*

22

*NHC from time to time.* During the Term, Employee shall devote Employee's full time, attention, and best efforts to advance the interests of Employer." (Emphasis added.)

And the record shows NueHealth compensated Ringel under this agreement in the amount of $215,000, the same amount Ringel offered to take when Regional President. So the court's refusal to enforce the alleged promise was not shown to sanction fraud or result in other injustice.

We agree with the district court that "[t]he promise Ringel seeks to enforce was part of an incomplete negotiation that never culminated with final terms of a binding agreement." We thus affirm the district court's grant of summary judgment on Ringel's promissory estoppel claim.

IV.    *Did the District Court Improperly Admit an Affidavit?*

Finally, Ringel argues that the district court abused its discretion by considering a late affidavit from NueHealth's lawyer, Scott Palecki. The district court permitted NueHealth to submit the affidavit within 10 days after the summary judgment hearing yet gave Ringel no opportunity to rebut it.

We review the trial court's consideration of evidence during a motion for summary judgment for an abuse of discretion. See *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 49, 661 P.2d 348 (1983); *Miskew v. Hess*, 21 Kan. App. 2d 927, 942, 910 P.2d 223 (1996). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

Generally, parties submit evidence in support of a summary judgment motion with the motion, before a hearing, if any, and the opposing party has an opportunity to rebut it.

23

See generally K.S.A. 2020 Supp. 60-256. So our focus here is on whether the district court's deviation from this standard procedure prejudiced Ringel.

NueHealth contends that Palecki's affidavit merely recited the facts that were already in the record via Dan Tasset's deposition, so no prejudice occurred. Ringel counters that Palecki's affidavit was instead "intended to fill an evidentiary gap."

Palecki's late affidavit said in relevant part:

"On Saturday, August 26, 2017, I met with NueHealth Chairman, Mr. Tasset, regarding several executive employment agreements. At this time, Mr. Tasset executed several of the Agreements, and those were dated as signed August 25, 2017. At the same time, Mr. Tasset signed Mr. Ringel's draft agreement, but he did not date his signature. Immediately after Mr. Tasset signed Mr. Ringel's draft agreement, he handed it back to me and instructed me not to release the document to Mr. Ringel or anyone else because Mr. Tasset was still assessing Mr. Ringel's performance. I held the document in escrow as per Mr. Tasset's instructions and never released the document because Mr. Tasset never authorized or instructed me to do so."

Tasset's deposition was to the same effect. Tasset said that he had several regional presidents and their agreements were all different, but he wanted them to be the same. So he would negotiate the contracts individually and then revise the agreements and release them all at the same time. When Tasset was asked whether he signed the August employment offer for Ringel, he responded:

"A. My answer is I signed it and gave it to our counsel and asked our counsel to hold it, do not release it until I have a chance to assess whether or not Mr. Ringel was capable of performing this job.
"Q. Okay.
"A. That's my answer.
"Q. Okay. And what was the date that you signed it?

24

"A. It's not dated because, again, I gave it to counsel and had counsel hold it until I authorized the release if and when I determine Mr. Ringel was capable of performing, which he clearly was not and we didn't execute the document."

Upon comparison, we find no significant differences between Palecki's and Tasset's recitation of the facts.

We find guidance from *Mays*, 233 Kan. at 47-49. There, during oral arguments on a summary judgment motion, the defendant asked the district court to consider a fact that had not been included in the summary judgment documents but "did not contain any material new to the plaintiff." 233 Kan. at 49. The additional facts were already well known to the plaintiff, and no one claimed the additional facts were inaccurate. Our Supreme Court held:  "Even assuming the district court did rely in part on the additional statement, we see no prejudice to the plaintiff. The allowance of the additional statement was within the discretion of the district court and we find no abuse of that discretion." 233 Kan. at 49.

Our case is similar. First, the district court, when citing Tasset's actions related to signing the employment agreement, did not cite Palecki's affidavit but Tasset's deposition. This suggests that if the district court relied at all on the late affidavit, it relied more so on Tasset's deposition. Second, the facts in the affidavit, like those in the deposition, were uncontroverted. And third, even if the district court relied in part on Palecki's affidavit, it merely considered facts that were already well known to Ringel and included no new material. Here, as in *Mays*, we see no prejudice to Ringel, so we find no abuse of discretion. See *Mays*, 233 Kan. at 47-49.

Affirmed.